**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                       )
IN RE: COVIDIEN HERNIA MESH            )
PRODUCTS LIABILITY LITIGATION          )        MDL
NO. II                                 )        No. 22-md-03029-PBS
_____)
                                       )
LARRY PATTERSON and TAMMY              )
PATTERSON,                             )
                                       )
                Plaintiffs,            )
                                       )        Civil Action
v.                                     )        No. 22-cv-10153-PBS
                                       )
COVIDIEN, INC., et al.,                )
                                       )
                Defendants.            )
_____)
```

**MEMORANDUM AND ORDER**

April 27, 2026

Saris, J.

**INTRODUCTION**

This multidistrict litigation involves hernia mesh products manufactured by Defendants Covidien LP and Sofradim Production SAS (together, "Covidien"). In the first bellwether case, Plaintiff Larry Patterson ("Plaintiff") alleges that he was implanted with a Symbotex Composite Mesh ("Symbotex") during a 2017 hernia repair operation and that the Symbotex adhered to his bowel and eventually caused a bowel obstruction and hernia recurrence necessitating another operation in 2020. Plaintiff brings products liability claims against Covidien under Alabama law, including claims under

1

the Alabama Extended Manufacturer's Liability Doctrine and for negligence, breach of warranty, and negligent and fraudulent concealment and misrepresentation.

Plaintiff's main theory of liability centers on Symbotex's porcine (i.e., from pigs) collagen barrier, which is meant to prevent the mesh from attaching to other organs and tissues in the abdomen during the initial stages of healing following a hernia repair. Plaintiff claims that this barrier could significantly, if not entirely, degrade within seven days of implantation, leaving the bowel exposed to Symbotex's inflammatory polyester material. Plaintiff alleges that Symbotex is defectively designed for this reason and that Covidien failed to accurately warn physicians and patients about this dangerous feature of the product.

The parties have filed motions to exclude the testimony of eleven expert witnesses under Federal Rule of Evidence 702. This opinion addresses Covidien's motion to exclude the testimony of Dr. Stephen Ferzoco, a surgeon offered by Plaintiff to opine on general and specific causation, safer alternative designs, and the adequacy of Covidien's warnings.

After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Covidien's motion to exclude the testimony of Dr. Ferzoco (Dkt. 41).

## BACKGROUND

### I.    Symbotex

Symbotex is a surgical mesh manufactured and sold by Covidien. It is one of many surgical meshes on the market, which differ in material, construction, pore size, and other characteristics. Symbotex is made from a non-absorbable monofilament polyester textile. The mesh is implanted during a hernia repair to provide long-term reinforcement of the tissue, with the aim of preventing recurrence. The side of the mesh facing away from the reinforced tissue has an absorbable coating consisting of porcine collagen and glycerol. The purpose of this coating is to minimize tissue attachment to the mesh if the mesh comes into direct contact with other organs and tissues in the abdomen while the patient's peritoneum -- a cellular barrier -- regrows or "reperitonealizes."

Symbotex is a Class II medical device cleared by the FDA under the § 510(k) premarket notification process in August 2013. Under the § 510(k) process, the FDA may "'clear' a device that is substantially equivalent in safety and effectiveness to an existing [legally marketed] device and thereby allow the device to be used for the same intended purposes." Zhou v. Desktop Metal, Inc., 120 F.4th 278, 284 (1st Cir. 2024) (quoting Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 232 (1st

Cir. 2015)).[1] In its § 501(k) notification, Covidien listed as predicate devices various "Parietex"-brand meshes it also manufactures, including the Parietex Composite Mesh ("PCO") and the Parietex Optimized Composite Mesh ("PCOx"). Like Symbotex, both PCO and PCOx are polyester meshes with a porcine collagen barrier. The FDA determined that Symbotex was substantially equivalent to these predicate devices.

Symbotex's instructions for use ("IFU") state that the product "is intended for the reinforcement of abdominal wall soft tissue where a weakness exists, in procedures involving primary abdominal wall and incisional hernia surgeries." Dkt. 54-16 at 2. According to the IFU, Symbotex's "absorbable hydrophilic film minimizes tissue attachment to the mesh in case of direct contact with the viscera," and the "collagen film is essentially degraded

---

[1] "At least ninety days before introducing a new device to the market, a manufacturer seeking § 510(k) clearance must submit a premarket notification to the FDA." United States v. Facteau, 89 F.4th 1, 14 (1st Cir. 2023). This submission must disclose proposed labeling and marketing materials for the new device and provide data demonstrating substantial equivalence with the pre-existing device. See Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 345 (2001); Facteau, 89 F.4th at 14. "If the FDA concludes on the basis of the § 510(k) notification that the device is 'substantially equivalent' to a pre-existing device, it can be marketed without further regulatory analysis." Medtronic, Inc. v. Lohr, 518 U.S. 470, 478 (1996). Unlike potentially more dangerous Class III devices subject to a more fulsome premarket approval process, "devices that enter the market through § 510(k) [process] have 'never been formally reviewed . . . for safety or efficacy.'" Riegel v. Medtronic, Inc., 552 U.S. 312, 323 (2008) (quoting Lohr, 518 U.S. at 493).

4

in less than 1 month." Id. The IFU lists the "possible complications associated with" Symbotex as "seroma, hematoma, recurrence, adhesions, fistula formation, infection, inflammation, chronic pain, and/or allergic reactions to the components of the product." Id. The IFU warns that "[p]otential events associated with state of the art mesh with similar indication may include: organ injury (including bowel and visceral injury), trocar-site herniation, bowel obstruction and urinary retention." Id.

Other Covidien marketing materials tout Symbotex's collagen barrier as well. Symbotex's Value Analysis Committee Product Information Kit ("vac pac"), for example, discusses animal studies showing that "[t]he anti-adhesion collagen barrier remained intact after 7 days" and "[s]mall bowel adhesion was never observed in all groups receiving the composite mesh." Dkt. 90-6 at MDT-MA-00921872. The vac pac also summarizes four clinical studies examining Parietex meshes that were published between 2005 and 2010 to support the efficacy and safety of Symbotex.

Plaintiff's claims largely rest on evidence that Symbotex's porcine collagen barrier degrades more rapidly than the period of up to one month indicated on the IFU. In 2004, Covidien changed the composition of the barrier on PCO, a predicate device to Symbotex, from bovine (cow) to porcine (pig). Covidien conducted a rat study the prior year, "Study #12778," to test "the capability of the porcine collagen meshes to decrease the risk of visceral

5

adhesion & erosion, in comparison to bovine collagen mesh". Dkt. 90-8 at MDT-MA-00464028. Study #12778 showed that "[a]t 7 days of implantation, the film resorption of [the] groups [implanted with porcine collagen mesh] is completed whereas it is starting for [the] group [implanted with bovine collagen mesh]." Id. at MDT-MA-00464034. The same study found "no difference in the cellular inflammatory reaction between the . . . groups" and no statistically significant difference in the occurrence of adhesions. Dkt. 90-8 at MDT-MA-00464034. In November 2018, Covidien received a report of a patient who had his Symbotex explanted only three days post-surgery due to complications from the procedure. As part of its assessment of the report, Covidien identified that there was no "coating on about 80% of the mesh." Dkt. 90-22 at MDT-MA-08498467.

According to Covidien's chief scientist, Study #12778 demonstrated that "the barrier is not functioning . . . [a]fter about a week," although he noted his belief that this was "over the critical time window for tissue attachment formation." Dkt. 90-21 at 7. The chief scientist also conceded that if "some bare parts of the mesh [are] exposed to the bowel during this critical time window," there is a "risk of more tissue attachment formation." Id. at 8. Covidien's senior director of clinical research indicated that adhesions could start within a few weeks

of implantation "[i]f the coating is not doing its job." Dkt. 87-5 at 3.

In response, Covidien stresses clinical data that, in its view, demonstrates Symbotex's safety. For instance, Köckerling (2018) analyzed registry data one year post-surgery for patients who underwent elective hernia repairs. The study found a lower rate of hernia recurrence among the ninety-three patients who were implanted with Symbotex than among those who were implanted with any other mesh analyzed. Gillion (2019) followed one hundred patients who were implanted with Symbotex for two years post-surgery and observed only one recurrence. At the end of the two-year period, 87.1% of patients reported no pain or discomfort.

## II.   <u>Plaintiff's Surgery and Injuries</u>

In March 2016, Plaintiff received a CT scan for abdominal pain and constipation, which revealed an umbilical hernia. On July 26, 2017, Plaintiff went to the emergency department with a bulged out hernia and moderate abdominal pain. The next day, Dr. Lucian Newman III performed a laparoscopic repair of Plaintiff's hernia with a Symbotex mesh. During the operation, Dr. Newman used a bridging technique in which he brought the edges of the tissue closer together and then implanted the mesh to cover the remaining gap. Plaintiff had a history of diabetes and, at the time of his hernia repair, had a body mass index ("BMI") of around 30.

Dr. Newman's practice was to discuss the risks of the hernia repair surgery, including the possibility of bowel adhesions and recurrence, with his patients before conducting the surgery. Plaintiff signed a consent form indicating that Dr. Newman had informed him of the risks of the surgery.

Dr. Newman has performed at least one hundred hernia repairs using Symbotex. He is aware of the risks of the surgery, including obstructions. Dr. Newman has not read an IFU for any product in many years and has no memory of ever reviewing Symbotex's IFU. At his deposition, Dr. Newman stood by his decision to use Symbotex for Plaintiff's hernia repair surgery and testified that he did not believe Plaintiff's outcome would have differed with another mesh. In a supplemental declaration, however, Dr. Newman explained that his decision to use Symbotex for Plaintiff's surgery rested on his "belief that the absorbable collagen barrier would last long enough" -- up to thirty days -- "to protect the mesh from forming adhesions to the internal organs." Dkt. 95-12 ¶ 6. He added that he "relied upon the sales representatives from Covidien to advise [him] about the unique characteristics of its products"; that "[n]o one from Covidien . . . ever informed [him] that the collagen barrier could be resorbed within seven days"; and that he would have used another mesh for Plaintiff's surgery "[h]ad [he] known . . . that the collagen barrier could be resorbed within

seven days or anything substantially less than thirty days." Id.
¶ 9.

On July 1, 2020, Plaintiff sought emergency care for sharp,
burning abdominal pain and nausea. He was diagnosed with a small
bowel obstruction and an incarcerated hernia at the level of his
umbilical hernia repair. Dr. Newman performed another surgery the
next day to repair the recurrent hernia and bowel obstruction. In
his operative report, Dr. Newman wrote that he found a
"minimal/small hernia with bowel stuck and obstructed at level of
old repair" and that he removed a "3[-]inch segment of bowel . . .
at point of obstruction stuck tightly to old mesh." Dkt. 54-20 at
3.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of
expert testimony in federal court. See D'Pergo Custom Guitars,
Inc. v. Sweetwater Sound, Inc., 111 F.4th 125, 139 (1st Cir. 2024).
Under Rule 702:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than
> not that:
>
> (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact
> to understand the evidence or to determine a fact
> in issue;
>
> (b) the testimony is based on sufficient facts or
> data;

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

At core, Rule 702 tasks district courts with serving as "'gate-keeper[s]' . . . to 'ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand."'" Hoover v. Hyatt Hotels Corp., 99 F.4th 45, 58 (1st Cir. 2024) (first alteration in original) (quoting United States v. Vargas, 471 F.3d 225, 261 (1st Cir. 2006)). The proponent of any expert testimony bears the burden of proving its admissibility under Rule 702's criteria by a preponderance of the evidence. See Doucette v. Jacobs, 106 F.4th 156, 169 n.17 (1st Cir. 2024); Rodríguez v. Hosp. San Cristobal, Inc., 91 F.4th 59, 66, 71 (1st Cir. 2024); see also ZipBy USA LLC v. Parzych, 171 F.4th 55, 61 (1st Cir. 2026) (explaining that admissibility turns on whether "the party offering the expert testimony 'demonstrates to the court that it is more likely than not that' the Rule 702 requirements are satisfied" (quoting Fed. R. Evid. 702)).

"[A]n expert's opinion must be relevant 'not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in

issue." Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC, 752 F.3d 82, 91 (1st Cir. 2014) (quoting Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998)). Additionally, when examining the reliability of expert testimony, a court must train its attention "solely on principles and methodology, not on the conclusions that they generate." Rodríguez, 91 F.4th at 70 (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993)). Thus, the "party who proffers expert testimony" need not "prov[e] to the judge that the expert's assessment of the situation is correct." ZipBy USA, 171 F.4th at 61 (quoting Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 99 (1st Cir. 2020)). The following non-exclusive factors guide a court's determination of the reliability of an expert's methodology: (1) "whether the expert's methodology has been objectively tested"; (2) "whether it has been subjected to peer review and publication"; (3) "the technique's known or potential error rate"; and (4) "whether the expert's technique has been generally accepted within the relevant industry." Lawes, 963 F.3d at 98; see Bricklayers, 752 F.3d at 91.

"A district court is well-justified in striking opinion testimony that depends upon 'the ipse dixit of the expert' or that evinces significant 'analytical gap[s] between the data and the opinion proffered.'" Doucette, 106 F.4th at 169 (alteration in original) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146

11

(1997)). "Thus, an expert's 'failure to point to and consider material' elements of the record she purports to be analyzing can be grounds for a district court's exclusion of the proffered testimony." Id. (quoting González-Arroyo v. Drs.' Ctr. Hosp. Bayamón, Inc., 54 F.4th 7, 15 (1st Cir. 2022)).

## DISCUSSION

The Court begins by summarizing Dr. Ferzoco's qualifications and opinions. The Court then turns to the specific challenges Covidien raises to the admissibility of his expert testimony.

## I.   Summary of Dr. Ferzoco's Qualifications and Opinions

Dr. Ferzoco is a board-certified general surgeon specializing in gastrointestinal and general surgery. He founded and directed the Brigham and Women's Hernia Center at Faulkner Hospital in Massachusetts. He has treated thousands of patients and repaired many types of hernias using different techniques and products. He regularly treats patients with complications following use of a hernia mesh product, including Symbotex. Covidien does not challenge Dr. Ferzoco's qualifications, and the Court finds that he is qualified as an expert to address causation, alternative design, and warnings from a surgeon's perspective.

In his expert report, Dr. Ferzoco first opines that "[t]he polyester of the Symbotex induces [an] undesired chronic inflammatory response." Dkt. 54-7 at 4. He cites animal studies showing increased inflammation with other polyester meshes,

12

including various Parietex meshes, in comparison to meshes made of materials like polypropylene. He also cites clinical studies finding that patients implanted with a polyester mesh suffered more complications, such as recurrences, mesh shrinkage and issues with wound healing, than those implanted with a polypropylene mesh. He then explains that:

> Chronic inflammation induces adhesions/dense fibrosis (scarring). As a result of the significant foreign body reaction and extensive fibrosis and adhesion formation, polyester mesh is known to shrink in vivo more than polypropylene mesh. Notably, in the setting of a [PCO] mesh implant, adhesion formation continued to increase during the first 12 months after implantation, not reaching a steady state. Scar tissue contracts over time, increasingly pulling on the mesh, creating a pain sensation and increasing the risk of recurrence as the adhesions exert a greater pulling force as they become denser.

Id. at 5 (footnotes omitted). In time, these adhesions may sufficiently contract to cause a bowel obstruction or a hernia recurrence if the mesh is pulled from the abdominal wall.

Given this interaction between polyester and tissue, Dr. Ferzoco opines that use of a polyester mesh in the intraperitoneal space requires that "any protective coating or film" be "(1) effective and (2) completely cover[] the polyester for the amount of time that it takes for a patient's body to fully reperitonealize (i.e., the meseothelial [sic] cells re-grow to cover the viscera and form a natural barrier to protect delicate structures from being in direct contact with the polyester)." Id.

13

at 5. In his view, the coating or film should last in full for at least four weeks to account for the varying periods it takes patients to fully reperitonealize. Moreover, an ongoing inflammatory response may inhibit wound healing and increase the period of time necessary for full reperitonealization.

Citing Study #12778 and deposition testimony from Covidien's chief scientist, Dr. Ferzoco states that "the collagen film of the Symbotex is essentially gone and non-functioning just 7 days after implantation." Id. at 6. Dr. Ferzoco also cites Covidien's receipt of an adverse event report indicating that the collagen film on the Symbotex implanted into a patient had degraded 80% within three days; Covidien's receipt of similar complaints from surgeons about the PCOx; and Covidien's acknowledgment in internal communications that the collagen film degraded within around a week of implantation.

Dr. Ferzoco then comments on Symbotex's IFU and Covidien's marketing materials. He opines that the IFU "would lead a surgeon to falsely believe that the collagen film provides protection for approximately 1 month." Id. at 7. Similarly, he notes that Covidien's marketing materials, including the Symbotex vac pac, "provided inaccurate information regarding the effectiveness of the collagen film." Id. at 8. He explains, for instance, that three clinical studies cited in the vac pac to show that Symbotex is not associated with adhesions or that the collagen barrier remains

14

intact after seven days -- Therin (1998), Balique (2005), and Chelala (2010) -- involved meshes implanted before Covidien transitioned from bovine to porcine collagen in 2004. Dr. Ferzoco concludes that "Covidien's marketing materials and sales representative talking points on the Symbotex were inaccurate and highly misleading regarding key features that surgeons based their decision on when deciding which hernia mesh to select for a patient." Id. at 11.

Dr. Ferzoco subsequently evaluates various animal studies Covidien conducted between 2010 and 2013 about the efficacy of porcine collagen barriers on its hernia meshes. He explains that after Covidien implemented a project to improve its collagen barrier, it conducted an animal study showing "3 times as many of the PCOx meshes were 100% covered in adhesions" as the PCO meshes with an older collagen barrier formulation. Id. Another study around the same time found some adhesions on half of PCOx meshes. A third study demonstrated "adhesions to the bodies in 92% of cases with [Symbotex] compared to 42% for the product [PCOx] and 100% for the positive control." Id. at 13. Dr. Ferzoco notes that despite these findings, Covidien claimed that these studies showed that Symbotex and its newer collagen barrier performed as well or better than the older products.

Dr. Ferzoco next conducts a differential diagnosis to determine the cause of Plaintiff's injuries. A "[d]ifferential

15

diagnosis is a standard technique for 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.'" Rodríguez-Díaz v. Seguros Triple-S, Inc., 636 F.3d 20, 21 (1st Cir. 2011) (quoting Stedman's Medical Dictionary 492 (27th ed. 2000)). Based on his differential diagnosis, Dr. Ferzoco opines that the Symbotex implanted in Plaintiff was the cause of his injuries.

Dr. Ferzoco notes that Dr. Newman properly diagnosed Plaintiff's hernia, deemed him an appropriate candidate for surgical repair, and conducted the procedure in line with the standard of care. He explains that there was "sufficient overlap on all sides" of the hernia "to properly fixate the mesh without tension." Id. at 22. As Plaintiff complied with all post-operative and wound care instructions, Dr. Ferzoco rules out non-compliance as a cause of his injuries.

Dr. Ferzoco also concludes that Plaintiff's comorbidities and surgical history did not contribute to his injuries. While Plaintiff had a BMI of around 30 at the time of his surgery, Dr. Ferzoco rules out obesity on the basis that Plaintiff's "BMI dropped below 30 immediately after the surgery and remained under 30 for at least the next 3-6 months" such that he "was not obese during the wound hearing period after the surgery." Id. at 23. He also notes that one of Plaintiff's treating physicians stated that

16

he was not concerned that Plaintiff's weight would affect wound healing. Dr. Ferzoco eliminates Plaintiff's diabetes as a cause too, explaining that while Plaintiff "had episodes of poorly controlled diabetes, his hernia repair lasted nearly three years before recurring and [his] infection and wound problems did not occur until after the Symbotex mesh failed and necessitated a second surgery." Id. at 24. He adds that during the "revision surgery, the Symbotex was found to be incorporated," which would not have been the case if Plaintiff "had impaired wound healing due to diabetes or other reasons." Id. Finally, Dr. Ferzoco rules out a hernia recurrence as the cause of Plaintiff's adhesions "because of how densely [his] bowel was adhered to the Symbotex." Id. at 25. Given that "[d]ense adhesions . . . take time to form," Dr. Ferzoco opines that Plaintif's "bowels began adhering to the Symbotex shortly after it was implanted, likely within the first 7 days or so." Id.

Lastly, De. Ferzoco opines on safer alternative designs. The entirety of his opinion on the issue is as follows: "Numerous safer, feasible alternative designs existed at the time of [Plaintiff's] implant, including a lighter-weight, flat, bare, polypropylene mesh in the retro rectus space, or the Ventralight ST (a polypropylene mesh with a resorbable adhesions barrier) in the intraperitoneal space." Id. at 26.

17

## II.  Analysis

Covidien challenges four aspects of Dr. Ferzoco's testimony: (1) his general causation opinions that Symbotex's combination of polyester material and a rapidly degrading collagen barrier causes adhesions that can lead to a bowel obstruction or hernia recurrence; (2) his specific causation opinion based on a differential diagnosis that Plaintiff's injuries were caused by the Symbotex; (3) his opinions on safer alternative designs to Symbotex; and (4) his opinions that Symbotex's IFU and Covidien's marketing materials inadequately warned about the rapidly degrading collagen barrier and associated risks. The Court addresses these four issues seriatim.

### A.   General Causation

Covidien first launches a multi-pronged assault on Dr. Ferzoco's general causation opinions that Symbotex's combination of polyester material and a rapidly degrading collagen barrier causes adhesions that can lead to a bowel obstruction and hernia recurrence. Covidien emphasizes that all hernia repair surgeries carry risks of these complications and argues that clinical data show that Symbotex is safe and has similar or better outcomes in comparison to other hernia mesh products. In Covidien's view, Dr. Ferzoco improperly ignores this clinical data in favor of cherry-picked animal studies without offering any reliable basis for extrapolating from those studies to clinical outcomes in humans.

18

Covidien also contends that Dr. Ferzoco impermissibly relies on data involving hernia meshes other than Symbotex.

The main thrust of Covidien's challenge to Dr. Ferzoco's general causation opinions rests on his reliance on animal studies in lieu of any consideration of clinical data. Among the evidence that scientists consider in assessing causation are animal studies. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 780 (3d Cir. 1994); In re Paraquat Prods. Liab. Litig., 730 F. Supp. 3d 793, 808 (S.D. Ill. 2024); In re Neurontin Mktg., Sales Pracs., & Prods. Liab. Litig., 612 F. Supp. 2d 116, 127 (D. Mass. 2009); In re Rezulin Prods. Liab. Litig., 369 F. Supp. 2d 398, 406 (S.D.N.Y. 2005). As this Court has previously explained, "[a]nimal studies have the advantage of being able to be conducted as true experiments, with exposure controlled and measured. However, extrapolation from animal studies to humans entails some risks, as physiological differences and dosage differences can complicate comparisons." In re Neurontin, 612 F. Supp. 2d at 127; see In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II) ("In re Mirena I"), 341 F. Supp. 3d 213, 229 (S.D.N.Y. 2018); see also David L. Eaton, Bernard D. Goldstein & Mary Sue Henifin, Reference Guide on Toxicology, in Fed. Jud. Ctr., Reference Manual on Scientific Evidence 1027, 1061 (4th ed. 2025) (explaining that reliance on animal studies requires "[t]wo types of

19

extrapolation . . . : from animal data to humans and from higher doses to lower doses").

An expert opinion on general causation is not per se inadmissible simply because the expert does not rely on epidemiological or clinical studies involving humans. See Milward v. Acuity Specialty Prods. Grp. ("Milward I"), 639 F.3d 11, 24 (1st Cir. 2011). But given the limitations of animal studies, courts often scrutinize expert opinions that rely primarily on such studies. An "expert must be prepared to explain how such studies can be reliably extrapolated to prove comparable effects in humans." In re Prempro Prods. Liab. Litig., 738 F. Supp. 2d 887, 894 (E.D. Ark. 2010); see Hardeman v. Monsanto Co., 997 F.3d 941, 963 (9th Cir. 2021) ("Animal studies are relevant evidence of causation where there is a sound basis for extrapolating conclusions from those studies to humans in real-world conditions."). In addition, a court may exclude an expert opinion on causation based on animal studies when there is significant epidemiological or clinical evidence indicating the absence of causation. See Milward I, 639 F.3d at 24; In re Heparin Prods. Liab. Litig., 803 F. Supp. 2d 712, 727 (N.D. Ohio 2011); cf. In re Paoli, 35 F.3d at 780 (noting that animal studies may be inadmissible "in the face of extensive epidemiological data that failed to support causation" (emphasis in original)).

More generally, "courts have consistently excluded expert testimony that 'cherry-picks' relevant data" and thereby engages in a "[r]esults-driven analysis." In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502, 892 F.3d 624, 634 (4th Cir. 2018) (quoting EEOC v. Freeman, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring)). And "where an expert's medical opinion is grounded exclusively on scientific literature, a district court acts within its discretion to require the expert to explain why []he relied on the studies that []he did and, similarly, why []he disregarded other, incompatible research." Milward v. Rust-Oleum Corp. ("Milward II"), 820 F.3d 469, 474 (1st Cir. 2016).

Plaintiff has met his burden of demonstrating that the evidence and data Dr. Ferzoco cites in support of his general causation theory are sufficiently reliable to satisfy the admissibility criteria under Rule 702. As an initial matter, Covidien does not expressly argue that Dr. Ferzoco lacks a reliable basis to opine that Symbotex's collagen barrier degrades prematurely. In support of this opinion, Dr. Ferzoco cites Study #12778, a Covidien animal study showing resorption of the porcine barrier within seven days of implantation; various Covidien corporate depositions acknowledging the barrier's resorption period; and a 2018 case report in which the barrier was found mostly degraded three days post-implantation. The absence of

published clinical data showing premature resorption of Symbotex's barrier is not fatal to the reliability of this aspect of Dr. Ferzoco's theory, as testing the barrier's resorption in humans in the period immediately following a hernia repair would require reopening patients. Given this ethical limitation, animal studies and anecdotal case reports are a reliable basis for reaching a scientific conclusion about the resorption period of the barrier. See In re Tylenol (Acetaminophen) Mktg., Sales Pracs., & Prods. Liab. Litig., 198 F. Supp. 3d 446, 458 n.32 (E.D. Pa. 2016) (explaining that "courts allow expert testimony premised on animal studies" when "human studies cannot be done for ethical reasons" (quoting In re Levaquin Prods. Liab. Litig., No. 08-1943, 2010 WL 8400514, at *4 (D. Minn. Nov. 8, 2010))); see also Eaton et al., supra, at 1042 (recognizing that animal studies may provide "information relevant to the assessment of causation" given ethical limitations on human studies).

Covidien does challenge the reliability of the next step in Dr. Ferzoco's general causation theory, i.e., that the premature resorption of Symbotex's collage barrier exposes inflammatory polyester that causes adhesion formation. For this aspect of his theory, Dr. Ferzoco relies on (1) published animal studies demonstrating greater inflammation with polyester meshes than with polypropylene meshes; (2) clinical data showing greater complications with non-Symbotex polyester meshes than with

22

polypropylene meshes, including more recurrences and mesh shrinkage; (3) published animal studies regarding the formation of adhesions that build up over time with non-Symbotex polyester meshes; and (4) Covidien animal studies showing the formation of adhesions with the porcine collagen barrier. Covidien emphasizes that Dr. Ferzoco fails to cite any clinical studies on Symbotex specifically in support of this step of his analysis or offer any basis to extrapolate from animal data on polyester's inflammatory nature to the effects of polyester in humans.

It is true that Dr. Ferzoco neither cites any clinical data on whether Symbotex generates an inflammatory response or causes adhesions nor expressly explains why the animal study data on which he relies may be extrapolated to humans. But Covidien does not cite any clinical data on the formation of adhesions in patients implanted with Symbotex, instead emphasizing studies concerning the rate of recurrences and other complications in such patients.[2] The undisputed purpose of Symbotex's collagen barrier -- to prevent the formation of adhesions -- lends credence to Dr. Ferzoco's general causation theory.

---

[2] Covidien cites to the report of one of its experts, Dr. Andrew Wright, to support the proposition that "human clinical and registry data addressing how Symbotex performs in patients . . . do not show [an] increased risk[] of . . . adhesions." Dkt. 109 at 7. Dr. Wright's report discusses clinical data on recurrence rates, pain, and physician and patient satisfaction with Symbotex but does not specifically address any clinical data on adhesions.

Contrary to Covidien's argument, Dr. Ferzoco's opinion about the inflammatory effect of Symbotex's polyester material is not unreliable simply because he relies on data involving other hernia meshes that differ from Symbotex in certain design features such as whether they are monofilament or multifilament. At least some of the studies on which Dr. Ferzoco relies attribute the observed inflammatory response to the polyester material of the meshes they examined. Dr. Ferzoco could therefore reliably extrapolate from these studies to conclude that Symbotex's polyester material generates an inflammatory response. Covidien does not assert that Symbotex's polyester material differs in its chemical composition from the polyester used to construct the meshes examined in the studies Dr. Ferzoco cites. Additionally, while Covidien does point to Dr. Ferzoco's opinion in a separate case that a monofilament hernia mesh like Symbotex is a safer alternative to multifilament hernia meshes, that case concerns whether the mesh causes infections rather than inflammation and adhesions. See Dkt. 55-1 at 3-4.

As Covidien emphasizes, there is one notable gap in the evidence Dr. Ferzoco offers in support of his general causation opinions. If, as he opines, Symbotex's prematurely degrading collagen barrier causes adhesions that may lead to a bowel obstruction and hernia recurrence, one would expect that clinical data would show significant rates of obstructions and recurrences

24

with use of Symbotex. Dr. Ferzoco conceded at his deposition that his report does not discuss any clinical data studying Symbotex. And as Covidien notes, Köckerling (2018) found a lower rate of hernia recurrence one year post-surgery among the ninety-three patients who were implanted with Symbotex than among those who were implanted with any other mesh analyzed.

While Covidien's argument about the clinical data on Symbotex and Dr. Ferzoco's disregard of that data may ultimately persuade a jury to discredit Dr. Ferzoco's general causation opinions, the Court concludes that Dr. Ferzoco's methodology is nonetheless reliable for purposes of Rule 702. The Court does not find the clinical studies Covidien cites to be so indicative of an absence of causation of adhesions that Dr. Ferzoco could not form a contrary opinion based on the other evidence like animal studies. As previously noted, the studies Covidien cites do not report on the rate of adhesions in patients implanted with Symbotex and, thus, do not discredit Dr. Ferzoco's theory of the mechanism by which Plaintiff's obstruction and recurrence occurred. The studies also have limitations. Köckerling (2018) analyzed the difference in recurrence rates between Physiomesh, a hernia mesh formerly manufactured by Ethicon, and all other meshes, including Symbotex. While the study found that Symbotex had the lowest recurrence among seven meshes, it does not indicate that this difference was statistically significant. As for Gillion (2019), the other

25

clinical study Covidien cites, Dr. Ferzoco explained at his deposition that he did not give it weight because its sample size was small, it did not involve a comparator group, and the patients were not examined or otherwise objectively tested to assess complications from their hernia repairs.[3]

For these reasons, the Court denies Covidien's motion to exclude the testimony of Dr. Ferzoco with respect to his general causation opinions.

**B.    Specific Causation**

Covidien's next set of arguments challenges the admissibility of Dr. Ferzoco's differential diagnosis and specific causation opinions. A differential diagnosis, which is "essentially a process of elimination" of potential causes of symptoms, "can be a reliable method of medical diagnosis." González-Arroyo, 54 F.4th at 16 n.10, 17 (emphasis omitted) (quoting Milward II, 820 F.3d at

---

[3] Covidien criticizes Dr. Ferzoco for giving no weight to Gillion (2019) for these reasons but then relying on various studies that also lack a comparator group or have smaller sample sizes or shorter follow-up times. Although an expert's inconsistent application of criteria when evaluating scientific literature may render his opinions unreliable, see, e.g., In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig., 858 F.3d 787, 797 (3d Cir. 2017), Covidien has not persuasively shown that Dr. Ferzoco's analysis exhibits such inconsistency. Many of the studies Covidien cites are listed only in Dr. Ferzoco's "materials considered list" and are not discussed in his report to support his opinions. Others are animal studies rather than clinical studies. Covidien does cite one clinical study without a comparator group that Dr. Ferzoco discusses in his report: Petro (2015). Covidien may cross-examine Dr. Ferzoco on the inconsistency between his reliance on Petro (2015) and his grounds for giving no weight to Gillion (2019).

26

472, 476); see Granfield v. CSX Transp., Inc., 597 F.3d 474, 486 (1st Cir. 2010) ("[A] differential diagnosis is a proper scientific technique for medical doctor expert testimony."). For an expert opinion based on a differential diagnosis to be admissible, however, the proponent of the opinion must demonstrate "that the steps taken as part of that analysis -- the 'ruling out' and the 'ruling in' of causes -- were accomplished utilizing scientifically valid methods." González-Arroyo, 54 F.4th at 17 (quoting Milward II, 820 F.3d at 476).

Covidien initially argues that Dr. Ferzoco failed to reliably rule in Symbotex as a potential cause of Plaintiff's injuries. Covidien criticizes Dr. Ferzoco for citing only Dr. Newman's discovery of strong, dense adhesions during Plaintiff's 2020 revision surgery to support his theory that adhesions started to form within a week of the 2017 surgery when the collagen barrier prematurely degraded. Covidien also asserts that Dr. Ferzoco provides no support for his assessment that dense adhesions take time to form and that he would expect to see such adhesions if the collagen barrier degraded before reperitonealization. Covidien stresses that Dr. Newman testified that he did not believe the Symbotex caused Plaintiff's injuries. See Dkt. 54-13 at 208.

The Court is satisfied that Dr. Ferzoco has reliably ruled in Symbotex for purposes of his differential diagnosis. Dr. Ferzoco reasoned that the collagen barrier on Plaintiff's Symbotex

27

resorbed within around a week of implantation before complete reperitonealization occurred, that the resulting exposure of bare polyester to the bowel triggered the start of adhesion formation, and that those adhesions built up over time and eventually caused Plaintiff's bowel obstruction and hernia recurrence. This opinion is consistent with Dr. Newman's discovery of dense adhesions stuck to the Symbotex. For this reason, Covidien's reliance on Robinson v. Davol Inc., 913 F.3d 690 (7th Cir. 2019), is misplaced. In Robinson, the court affirmed the exclusion of Dr. Ferzoco's causation testimony in part because, unlike here, "the phenomena that [he] described were not found in [the plaintiff]'s medical records or autopsy report." 913 F.3d at 695-96. Covidien demands too much in criticizing the lack of contemporaneous evidence that Plaintiff's adhesions started to form within a week of his first surgery. Such evidence will rarely exist unless a patient suffers immediate complications. And Dr. Ferzoco cites animal studies to support the notion that inflammation causes adhesions that build up and become denser over time, a proposition that both Covidien's chief scientist and one of its expert witnesses conceded at their depositions. See Dkt. 90-9 at 10; Dkt. 90-23 at 6, 13.[4]

---

[4] At his deposition, Dr. Ferzoco testified that "clinically in the real world" he "is seeing [complications from premature resorption of Symbotex's collagen barrier] as a problem in patients that have the required re-operative surgery." Dkt. 55-3 at 175.

Covidien next argues that Dr. Ferzoco's differential diagnosis opinion should be excluded because he failed to reliably rule out other potential causes for Plaintiff's injuries. Covidien first challenges Dr. Ferzoco's assessment of the Dr. Newman's use of a bridging technique for Plaintiff's surgery in which Plaintiff's muscle tissue was not entirely closed and the Symbotex spanned the defect. Covidien points to clinical data showing that hernia repairs using this technique have more than double the risk of recurrence as repairs in which the defect is closed. See Dkt. 55-9 at 6-7. Covidien argues that Dr. Ferzoco did not reliably rule out this cause because he focused on the fact that Dr. Newman placed the Symbotex properly and with adequate overlap on the tissue rather than on the bridging technique itself.

Covidien appears to be correct that use of the bridging technique is a distinct, albeit related, issue from whether there was an adequate overlap when Dr. Newman implanted the Symbotex. At his deposition, however, Dr. Ferzoco clarified that he did not believe the bridging technique caused Plaintiff's injuries because Plaintiff's Symbotex was stuck to his bowel via adhesions, which, in his view, led to the recurrence of Plaintiff's hernia. Covidien does not offer any basis for concluding that the bridging technique has any effect on the risk of adhesions or bowel obstructions.

Covidien also argues that Dr. Ferzoco failed to consider that urgent hernia repairs like Plaintiff's have at least four times

29

the rate of recurrences as elective hernia repairs. See Dkt. 55-13 at 8. But courts "do not require experts to eliminate all other possible causes of a condition for the expert's testimony to be reliable." Engilis v. Monsanto Co., 151 F.4th 1040, 1054 (9th Cir. 2025) (quoting Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1237 (9th Cir. 2017)). While Covidien may use the urgent nature of Plaintiff's hernia repair to raise doubts at trial about whether Symbotex caused Plaintiff's injuries, the fact that Dr. Ferzoco did not specifically rule out this possible cause does not render his differential diagnosis unreliable. In any event, as with the bridging technique, Covidien does not offer data indicating that urgent hernia repairs are associated with higher rates of adhesions or bowel obstructions.

Covidien next contends that Dr. Ferzoco failed to reliably rule out obesity (i.e., a BMI of 30 or higher) as a cause of Plaintiff's injuries. See Dkt. 55-9 at 5, 8 (finding that obesity increases the risk of a hernia recurrence). Dr. Ferzoco ruled out obesity because Plaintiff's "BMI dropped below 30 immediately after the surgery and remained under 30 for at least the next 3-6 months" such that he "was not obese during the wound hearing period after the surgery." Dkt. 54-7 at 23. Covidien asserts that this explanation is not based on sufficient facts because Plaintiff's medical records show that he was in fact obese during the wound healing period.

The Court disagrees. Plaintiff's medical records reflect a BMI of under 30 on four occasions over the two months following his July 2017 surgery, with one measurement of 32.2 during that period. Plaintiff's BMI was 30 in October 2017 and then rose to 31.9 in March 2018. Noting that Plaintiff's medical records show the same weight at four appointments during the two months post-surgery, Covidien posits that those measurements were "likely copy-forwarded from the first post-operative visit" and, thus, that Plaintiff's BMI may have actually been above 30 during that period. Dkt. 42 at 21-22. Covidien may probe this theory at trial, but the measurements in Plaintiff's medical records constitute a sufficient basis for Dr. Ferzoco's opinion that Plaintiff was largely not obese during the three-to-six months post-surgery during wound healing. Covidien also points out that Dr. Ferzoco testified at his deposition that most wound healing has occurred by six-to-twelve months post-surgery, see Dkt. 55-3 at 115, and that Plaintiff's medical records show that he was obese starting no later than eight months after his surgery. The parties may question Dr. Ferzoco about the key period of time for wound healing. On this record, however, Plaintiff has shown by a preponderance of the evidence that Dr. Ferzoco reliably ruled out obesity.

Finally, Covidien criticizes Dr. Ferzoco's decision to rule out diabetes as a potential cause of Plaintiff's injuries. Covidien

31

cites clinical data showing that patients with diabetes have an increased risk of hernia recurrence, see Dkt. 55-9 at 5, 8, and points to evidence that Plaintiff had high blood glucose levels or other indicia of uncontrolled diabetes around the time of his surgery and at various points between then and his revision surgery in July 2020. Covidien accuses Dr. Ferzoco of ignoring this evidence. But Dr. Ferzoco did recognize that Plaintiff had "high blood glucose level[s]" during his hospital stay and "episodes of poorly controlled diabetes" following the surgery. Dkt. 54-7 at 24. Dr. Ferzoco nonetheless ruled out diabetes as a cause of Plaintiff's injuries because the hernia recurrence and wound problems did not occur for three years post-surgery and because Plaintiff's "Symbotex was found to be incorporated" during the revision surgery, which would not have happened if Plaintiff "had impaired wound healing due to diabetes or other reasons." Id. Covidien does not develop any argument that this justification is an unreliable basis for ruling out diabetes.

Accordingly, the Court concludes that Dr. Ferzoco's differential diagnosis and specific causation opinion is admissible under Rule 702.

## C.   Safer Alternative Design

Covidien further seeks exclusion of Dr. Ferzoco's opinions regarding safer alternative designs for Symbotex. Dr. Ferzoco opines that there are two safer alternative designs: (1) a lighter-

weight, bare polypropylene mesh placed in the retro rectus space and (2) Ventralight ST.

Covidien contends, among other things, that Dr. Ferzoco does not offer sufficient facts or data or a reliable application of a valid methodology to support his conclusory opinions that these alternative designs are safer than Symbotex. The Court agrees. "A district court is well-justified in striking opinion testimony that depends upon 'the ipse dixit of the expert' or that evinces significant 'analytical gap[s] between the data and the opinion proffered.'" Doucette, 106 F.4th at 169 (alteration in original) (quoting Joiner, 522 U.S. at 146). Thus, a court may exclude expert testimony based on "the expert's failure to 'explain [a] conclusory finding' by reference to the facts at hand or by connecting those facts to relevant insights drawn from the expert's applied methodology or the academic literature." Id. (alteration in original) (quoting López-Ramírez v. Toledo-González, 32 F.4th 87, 95 (1st Cir. 2022)).

Dr. Ferzoco's expert report does not explain either of the proposed safer alternative design opinions in sufficient detail to allow the Court to conclude by a preponderance of the evidence that those opinions are "based on sufficient facts or data" or "the product of reliable principles and methods." Fed. R. Evid. 702(b)-(c). Both proposed safer alternative designs involve a polypropylene mesh that Dr. Ferzoco opines is less inflammatory

33

than a polyester one like Symbotex. See Dkt. 54-7 at 4-5; Dkt. 55-3 at 74, 76-77. Dr. Ferzoco's report does cite data to support that polypropylene is less inflammatory than polyester. But Dr. Ferzoco does not provide any further explanation as to why either a lighter-weight, bare polypropylene mesh placed in the retro rectus space or Ventralight ST constitutes safer alternative designs.

For example, Dr. Ferzoco does not clarify what the "retro rectus space" is or whether placing a mesh there was an appropriate method of repairing Plaintiff's hernia. And while he did state at his deposition that placing a mesh in the retro rectus space carries "no risk of [the mesh] coming into contact with the bowel," Dkt. 55-3 at 198-99, he does not discuss whether this method would increase the risk of other complications or affect the efficacy of the hernia repair based on any scientific data or his clinical experience. All Dr. Ferzoco provides is his "ipse dixit" that placing a lighter-weight, bare polypropylene mesh in the retro rectus space is a safer alternative design. Doucette, 106 F.4th at 169 (quoting Joiner, 522 U.S. at 146). That is insufficient.

The same is true about Dr. Ferzoco's opinion that Ventralight ST is a safer alternative design. He indicates that Ventralight ST has "a resorbable adhesion barrier," Dkt. 54-7 at 26, but does not offer any information or data about that barrier that would allow for a comparison with Symbotex's allegedly defective barrier. Nor

34

does he cite any data about the safety or utility of Ventralight ST to support the notion that this alternative mesh is less dangerous but similarly effective for hernia repairs. Again, the Court is left with Dr. Ferzoco's ipse dixit on these issues. The Court therefore excludes Dr. Ferzoco's opinions that a bare polypropylene mesh placed in the retro rectus space and Ventralight ST are safer alternative designs for Symbotex.

The Court rejects Plaintiff's efforts to expand Dr. Ferzoco's safer alternative design opinions in his opposition to Covidien's motion. There, Plaintiff characterizes Dr. Ferzoco's report as opining "that a polyester mesh with a longer-lasting barrier, such as a Symbotex with a bovine collagen film, would be a safer alternative" design. Dkt. 90 at 20. Plaintiff also asserts that "the Mersilene polyester mesh[] and all other predicate devices listed by [Covidien] in [its §] 501(k) submissions are viable alternative designs." Id. at 21. Dr. Ferzoco's report, however, does not expressly offer any such opinion. Rather, the report includes a section entitled "Safer Alternatives" that lists only a lighter-weight, bare polypropylene mesh placed in the retro rectus space and Ventralight ST. Dkt. 54-7 at 26. Nor does Plaintiff cite a supplemental expert report, deposition testimony, or affidavit indicating that Dr. Ferzoco intends to testify to any safer alternative designs beyond the two mentioned in his report.

35

Without any such evidence, Plaintiff may not use his briefing to expand Dr. Ferzoco's safe alternative design opinions.

### D.    Adequacy of Warnings

Finally, Covidien seeks to exclude Dr. Ferzoco's opinions about the warnings Covidien provided in the Symbotex IFU, in its marketing materials, and via its sales representatives. In brief, Dr. Ferzoco opines that these warnings were misleading and inadequate in their description of the resorption period of Symbotex's collagen barrier.

Covidien first asserts that Dr. Ferzoco is not qualified to opine on this issue because he has never worked for or interacted with the FDA and admitted he has not looked at an IFU for purposes of his medical practice in many years. See Dkt. 55-3 at 43, 105-06, 117. Although a medical doctor without sufficient regulatory experience may not testify about whether a manufacturer's warnings about a medical device comply with FDA regulations, most courts permit a medical doctor who practices in a relevant field to opine on the sufficiency of the warnings from an end-user's perspective. See, e.g., Kelley v. C.R. Bard, Inc., 644 F. Supp. 3d 1316, 1342 (N.D. Ga. 2022); In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig., 546 F. Supp. 3d 679, 689 (S.D. Ohio 2021); In re Mirena IUD Prods. Liab. Litig., 169 F. Supp. 3d 396, 422-23 (S.D.N.Y. 2016); Deutsch v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 440 (E.D.N.Y. 2011). But see In re C.R. Bard,

Inc., 948 F. Supp. 2d 589, 607 (S.D. W. Va. 2013) (excluding opinion of a medical doctor about the adequacy of IFUs for lack of qualification). Dr. Ferzoco is a surgeon with extensive experience in hernia repairs and, thus, is qualified to opine on the sufficiency of Covidien's warnings about the risks of Symbotex from a surgeon's perspective.

Covidien also argues that Dr. Ferzoco's failure to warn opinions would not "help the trier of fact to understand the evidence or to determine a fact in issue" because he does not identify any causal relationship between Plaintiff's injuries and the deficiencies in the warnings. Fed. R. Evid. 702(a). Covidien adds that the Symbotex IFU warned of the complications Plaintiff experienced and that Dr. Newman testified that could not recall ever reading Symbotex's IFU.

This argument is unpersuasive. It is true that to establish a failure to warn under Alabama law, Plaintiff must prove "that the failure to warn was the actual and proximate cause of [his] injury." Blackburn v. Shire U.S., Inc., 380 So.3d 354, 360 (Ala. 2022) (emphasis omitted) (quoting Wyeth, Inc. v. Weeks, 159 So.3d 649, 673 (Ala. 2014)). Plaintiff therefore must show that Dr. Newman would not have used Symbotex for his surgery had he received an adequate warning of the product's risks. See id. But Dr. Ferzoco need not point to evidence of, or opine on, causation for his

37

testimony on the adequacy of the warnings to be admissible under Rule 702.

Lastly, Covidien argues that Dr. Ferzoco's opinions regarding the adequacy of its warnings amount to improper legal conclusions. It is well established that "expert testimony on . . . purely legal issues is rarely admissible," as "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact." Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99-100 (1st Cir. 1997) (quoting Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1212 (D.C. Cir. 1997)); see In re Zofran (Ondansetron) Prods. Liab. Litig., 57 F.4th 327, 340 (1st Cir. 2023); Birkenstock US BidCo, Inc. v. White Mountain Int'l LLC, 806 F. Supp. 3d 156, 162 (D. Mass. 2025). This rule would prohibit Dr. Ferzoco from testifying that Covidien's warnings were inadequate under Alabama law. Dr. Ferzoco may, however, testify about his opinion that Covidien's warnings about Symbotex were deficient from a surgeon's perspective. See Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); Nieves-Villanueva, 133 F.3d at 100 (explaining that Rule 704(a) "allows the expert witness to offer his or her factual conclusion in order to aid the jury, which properly can choose to accept or reject it").

## ORDER

For the foregoing reasons, Covidien's motion to exclude the testimony of Dr. Ferzoco (Dkt. 41) is **ALLOWED** with respect to his opinions regarding safer alternative designs and otherwise **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge