UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: COVIDIEN HERNIA MESH PRODUCTS LIABILITY LITIGATION NO. II, | |
| This Document Relates To: | MDL No. 1:22-md-03029-PBS |
| Larry Patterson Case No. 1:22-cv-10153 | |

## RULE 16.5(d) JOINT PRETRIAL MEMORANDUM

Pursuant to Local Rule 16.5(d), the parties have conferred and jointly submit the following pretrial memorandum.

1. **The names, addresses, and telephone numbers of trial counsel:**

   **For Plaintiffs:**

   Kelsey L. Stokes
   Texas Bar No. 24083912
   STOKES & HOBBS LP
   5619 Summer Snow Dr.
   Houston, TX 77056-6109
   Tel: (832) 260-4447
   kstokes@stokeshobbsfirm.com

   Timothy M. O'Brien
   Florida Bar No. 055565
   LEVIN, PAPANTONIO,
   PROCTOR, BUCHANAN, O'BRIEN,
   BARR & MOUGEY, P.A.
   316 South Baylen St., Ste. 600
   Pensacola, FL 32502
   Tel: (850) 435-7084
   Fax: (850) 436-6084
   tobrien@levinlaw.com

   **For Defendants:**

   Jessica C. Wilson (BBO No. 692674)

1

DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110-1447
Tel: (617) 406-6000
Fax: (617) 406-6100
jessica.wilson@us.dlapiper.com

Lyn Pruitt
DLA Piper LLP (US)
10809 Executive Center Drive, Suite 205
Little Rock, AR 72211
Tel.: (501) 944-5510
Fax: (214) 665-5982
lyn.pruitt@us.dlapiper.com

Christopher G. Campbell
DLA Piper LLP (US)
One Atlantic Center
1201 West Peachtree St, Ste. 2900
Atlanta, GA 30309
Tel: 404-736-7808
Fax: 404-682-7874
christopher.campbell@us.dlapiper.com

**2.  Whether the case is to be tried with or without a jury:**

The parties have requested a jury trial.

**3.  A concise summary of the evidence that will be offered by the plaintiff, defendant, and other parties, with respect to both liability and damages (including special damages, if any):**

<u>Plaintiffs' Position</u>:

a)    Plaintiffs brought this action against Defendants for injuries Mr. Patterson sustained from Defendants' Symbotex Composite Mesh as Defendants failed to exercise reasonable care in designing, labeling, and marketing the Symbotex Composite Mesh ("Symbotex Mesh"). Plaintiffs have brought tort claims against Defendants sounding in strict liability, negligence, and negligent and fraudulent concealment and misrepresentation.

b)    Defendants' Symbotex Composite Mesh is made from a three-dimensional monofilament non-absorbable polyester textile (specifically PET) with one side of the mesh covered with an absorbable, supposedly continuous, porcine-based collagen film made from porcine origin and glycerol.

2

c) Defendants' claim the collagen side minimizes tissue attachment to the mesh so there is no direct contact between the polyester mesh and the viscera.

d) The polyester-based mesh induces a chronic inflammatory and foreign body response with an accumulation of proinflammatory macrophages, as well as other cells and enzymes that increases as Defendants' polyester-based mesh continues to degrade after implantation.

e) The persistent foreign body inflammatory reaction from Defendants' polyester-based meshes, including the Symbotex mesh, compounded by other design features, causes excessive scarring/fibrosis, dense adhesions, contraction, mesh deformation, and other damage to the surrounding tissue, which can lead to potentially catastrophic mesh-related complications, such as bowel obstruction, fistula formation, chronic pain, infection, bowel erosion/perforation, recurrence, nerve and organ damage, as well as additional complex surgeries, such as bowel resections.

f) When placed next to the bowel—as the Symbotex mesh was designed to be placed— it is imperative that the collagen coating (*i.e.*, the supposed "adhesion barrier") remain intact, completely covering the underlying polyester during the healing process (*i.e.*, reperitonealization), which is significantly prolonged in the presence of the highly inflammatory polyester.

g) Studies performed by or for Defendants (as well as those in the published literature), show that even slight or partial exposure of the polyester mesh to the intestines and other sensitive structures can cause catastrophic complications, such as dense adhesions that lead to a bowel obstruction necessitating bowel resection like was seen in Mr. Patterson.

h) The duration of the collagen coating—and the characteristics of the collagen's design that could have any effect on the duration of the coating—has a direct impact on complications seen in patients and therefore is a key data point when assessing the safety of any of Defendants' devices that are made with the collagen coating, including the Symbotex device.

i) Significantly, in 2004 the proprietary collagen film utilized in Defendants' coated devices underwent a formula change from bovine collagen to porcine collagen.

j) This was a significant material change to the collagen film, as the summary report on the study Covidien had done on the impacts of changing the film from bovine to porcine collagen concluded that, at seven days the porcine collagen film resorption is complete (*i.e.,* gone), whereas resorption was just starting for the bovine collagen.

k) Notwithstanding this significant difference in the duration of the two coatings at such a significant time point, Defendants continued to use clinical data from bovine-based collagen devices to demonstrate the safety of the new porcine-based collagen coated devices to surgeons around the globe.

3

l)    For decades, Defendants improperly used studies where a different collagen material was utilized in implantation to provide clinical evidence on the ability of Symbotex to prevent adhesions.

m)    As noted above, prior to the clearance of the Symbotex Mesh, Defendants' own study revealed that the porcine collagen coating was completely resorbed within seven days after implantation. which is not enough time for reperitonealization, and is well under the 30 days Defendants advertised to surgeons throughout the world.

n)    Although there was clear evidence that the coating resorbed several weeks prior to the 30 days claimed in the Instructions for Use ("IFU"), Defendants made sure their sales force was trained to tell surgeons the coating lasted 30 days—this messaging was so important that no sales representatives could enter the field until they passed a quiz marking "30 days" in response to a question on the coatings duration.

o)    In addition to Defendants' pre-market failures and concealment of Symbotex's defects, their post-market surveillance program was equally reckless and deficient, reflecting a complete breakdown in the duty to monitor product safety and to ensure that its sales representatives provided accurate information regarding the mesh's specifications.

p)    Defendants systematically ensured that adverse event reports were underreported, misclassified, or buried; their labeling deliberately omitted known failure mechanisms; and internal safety data directly contradicting the IFU was withheld from both regulators and physicians.

q)    These post-market failures were not inadvertent or isolated, they were the product of a calculated and ongoing disregard for post-market vigilance, patient safety, and regulatory compliance.  The evidence demonstrates a pattern of widespread data manipulation and concealment.

r)    This data manipulation was achieved by Defendants routinely miscoding a mesh's barrier failures and adhesion events into vague, catch-all categories such as "adverse event without identified device problem," effectively concealing the true extent of Symbotex's complications and undermining transparency.

s)    Further compounding the deception, Defendants submitted adverse event reports under obsolete or incorrect corporate names, intentionally obstructing FDA oversight and concealing safety information from the medical community and the public.

t)    The evidence demonstrates the porcine-based collagen coating on Defendants' Symbotex Composite Mesh does not adequately protect the intestines and underlying organs from the highly inflammatory polyester mesh, which can lead to catastrophic complications as was seen in Mr. Patterson.

u)  Numerous safer alternatives existed that would have prevented or reduced the risk of the complications seen in Mr. Patterson, including the use of the bovine-based collagen coating on a polyester device.

v)  Plaintiff Larry Patterson alleges that the Symbotex Composite Mesh is defective by design, and the Defendants' failed to warn physicians and users of the dangerous nature of the device including the porcine collagen barrier being gone or non-functional within seven days, leaving the bowel exposed to highly inflammatory polyester.

w)  Larry Patterson was implanted with Defendants' 9 cm Symbotex Composite Mesh on July 27, 2017, to treat an incisional hernia at the umbilicus.

x)  Dr. Lucian Newman, III implanted the Symbotex in Mr. Patterson in accordance with IFU as well as the marketing materials and information provided by Defendants' sales representatives.

y)  Dr. Newman, III relied on the manufacturer to inform him of risks associated with their products, and if a product was proven to be inferior, then he would not use it.

z)  Dr. Newman, III selected the Symbotex mesh for Mr. Patterson precisely because he believed the collagen barrier would remain intact long enough to prevent adhesion formation between the mesh and Mr. Patterson's internal organs.

aa) Dr. Newman III relied on Defendants' sales representatives to convey accurate information regarding the Symbotex mesh's characteristics, and that had he been advised before surgery that the collagen barrier could resorb within a week, he would have chosen an alternative device.

bb) Approximately three years after the Symbotex was implanted, Mr. Patterson presented to the Emergency Room with sharp, burning abdominal pain and nausea, where he was diagnosed with a small bowel obstruction at the level of his umbilical hernia repair.

cc) On July 2, 2020, Dr. Lucian Newman performed open surgery on Mr. Patterson during which he found bowel tightly adhered/stuck to the Symbotex, especially at the point of the small bowel obstruction.

dd) Because the mesh was so densely adhered to the small bowel, Dr. Newman was forced to remove several inches of Mr. Patterson's small bowel along with a portion of the Symbotex mesh.

ee) The pathology report noted that a portion of the small bowel measured 8 cm in length with adherent mesh.

5

ff)   Dr. Newman testified that he removed the portion of the mesh he could see but he did not believe that it was all of the Symbotex, which was later confirmed during a CT scan.

gg)   During this surgery, Dr. Newman also repaired a small recurrent hernia without mesh at this location.

hh)   Ten days after the bowel resection, Mr. Patterson returned with a fever, acute pain, purulent drainage, wound infection, and abscess.

ii)   The wound was opened, and a large amount of purulent material was removed in the emergency room. The wound was left open. A CT scan revealed a fluid collection at the incision site, small bowel adhered to the Symbotex hernia mesh, and a potential underlying fistula.

jj)   Mr. Patterson was started on IV antibiotics and discharged home the next day with home health care, a wound VAC, and an open, nonhealing wound measuring 5cm x 2cm x 4cm with serosanguinous drainage.

kk)   Mr. Patterson required home health and regular specialist appointments to maintain the wound VAC and address his chronic open wound.

ll)   After years of suffering, in April of 2022, Mr. Patterson was diagnosed with a ventral hernia with bowel obstruction as well as a chronic nonhealing wound since his July 2020 partial mesh removal and bowel resection.

mm)   Mr. Patterson continued to have complications in July 2022 when the mesh was noted to be "sticking out" of the wound and "oozing out fluid."

nn)   Mr. Patterson will need to have surgery at some point to remove the rest of the old mesh and repair the current hernia.

oo)   To date, Mr. Patterson is still plagued with complications related to the Symbotex implant, including chronic pain and an open abdominal wound with consistent drainage that is bandaged daily.

pp)   The damage caused by the defective Symbotex continues to significantly affect Mr. Patterson's life, both physically and mentally.

qq)   Mr. Patterson seeks damages for (1) Physical pain and mental anguish; (2) Permanent injuries and disfigurement; and (3) Aggravation of pre-existing condition.  Mrs. Patterson seeks damages for loss of consortium.

**Defendants' Position:**

a.   Covidien tested Symbotex extensively prior to bringing it to market. In 2013, FDA cleared Symbotex for use in the United States. Symbotex has been used by surgeons

to repair ventral hernias for more than a decade, and it remains on the market today.

b.  Defendants deny liability for all of Plaintiffs' claims. Symbotex is not defective in design or warning, and Mr. Patterson's injuries were not caused by any defect in Symbotex. No design alternative would have prevented Mr. Patterson's alleged injuries; Plaintiffs cannot demonstrate that Mr. Patterson would have had a different outcome with a different mesh, or even without mesh.

c.  Defendants provided adequate warnings to Mr. Patterson's surgeon, Dr. Newman III, regarding the risks associated with Symbotex. The Symbotex Instructions for Use ("IFU") expressly warned of the very injuries Mr. Patterson alleges, including recurrence, adhesions, bowel obstruction, chronic pain, and infection.

d.  Dr. Newman III testified that he did not rely on the Symbotex IFU, meaning any alleged deficiency in the warnings could not have caused Mr. Patterson's injuries. Dr. Newman III was independently aware of these risks through his experience and discussed the risks of Mr. Patterson's injuries with him, obtaining his informed consent.

e.  Symbotex's polyester design is safe and does not result in any clinically significant or heightened inflammation or degradation that impacts patient outcomes. Symbotex's porcine collagen barrier design also is safe and does not result in higher complication rates for patients.

f.  The resorption rate of Symbotex's collagen barrier is consistent with the Symbotex IFU which states the collagen film is essentially degraded in less than one month. The collagen barrier resorption rate also is sufficient to serve its intended purpose of minimizing adhesion formation.

g.  Defendants thoroughly tested Symbotex before its market release through preclinical studies confirming the safety of the mesh, including the collagen barrier's efficacy in minimizing adhesions.

h.  Clinical data also demonstrates the safety and efficacy of Symbotex mesh which remains on the market today with no safety-related recalls or other adverse regulatory action.

i.  Defendants adequately monitored post-market data regarding Symbotex and properly classified, reported, and disclosed complaints and adverse events to FDA.

j.  Mr. Patterson's complications were likely caused by a combination of technical, surgical, and patient-specific risk factors—not a product defect. Mr. Patterson's injuries are known complications of any hernia repair with mesh, regardless of the type of mesh used.

k.  Mr. Patterson had preexisting and complicating medical conditions that contributed to and/or caused him to develop a recurrent hernia, bowel obstruction, pain, and non-healing wound.

l.  The size of Mr. Patterson's mesh and the technique used to repair his hernia also increased his likelihood of developing the complications he experienced. Mr. Patterson failed to mitigate his damages.

m.  Plaintiffs' claim for punitive damages fails because there is no evidence of oppression, fraud, wantonness, or malice. Defendants thoroughly tested and warned of the potential complications with Symbotex. Defendants also monitored post-market data and disclosed complaints and adverse events to FDA. The clinical and preclinical data supports that Symbotex is safe and effective for ventral hernia repairs.

4.  **Facts established by pleadings or by stipulations or admissions of counsel:**

**<u>Joint Position</u>:**

a.  Defendants manufacture and market Symbotex Composite Mesh ("Symbotex").

b.  Symbotex is a polyester surgical mesh with a collagen coating on one side.

c.  On August 22, 2013, the U.S. Food and Drug Administration ("FDA") cleared Symbotex for marketing and sale in the United States "for the reinforcement of soft tissue where a weakness exists such as the repair of the primary abdominal wall and incisional hernias.

d.  On July 27, 2017, Mr. Patterson underwent urgent surgery performed by Dr. Lucian Newman III using a laparoscopic technique at which time a Symbotex was implanted.

e.  On July 2, 2020, Dr. Newman III removed a 3cm segment of bowel at the point of obstruction, which he described in his surgical note as "stuck tightly to the old mesh."

**<u>Defendants' Position</u>:**

Defendants submit that the following facts are not subject to reasonable dispute:

a.  Symbotex is a monofilament polyester mesh with an absorbable collagen film on one side.

b.  Symbotex is intended for reinforcement of abdominal wall soft tissue where a weakness exists, such as in primary abdominal wall and incisional hernia surgeries.

c.  Symbotex remains cleared for sale in the United States today.

d.  In March 2016, Plaintiff Larry Patterson received a CT scan for abdominal pain and constipation and was diagnosed with an incisional hernia.

e.   On July 27, 2017, Mr. Patterson underwent urgent laparoscopic hernia repair surgery with Symbotex performed by Dr. Lucian Newman III ("Dr. Newman").

f.   During the operation, Dr. Newman used a bridging technique in which he brought the edges of the tissue closer together and then placed the mesh to cover the remaining gap.

g.   Prior to performing the surgery, Dr. Newman discussed the risks and benefits of hernia repair surgery with Mr. Patterson and obtained Mr. Patterson's signed informed consent.

h.   Prior to Mr. Patterson's hernia repair, Dr. Newman discussed with Mr. Patterson the risk of adhesions, possible mesh removal, infection, and poor wound healing. It was Dr. Newman's standard practice also to discuss the risk of recurrence and bowel adhesions with patients undergoing a hernia repair procedure with mesh.

i.   The instructions for use ("IFU") for Symbotex warns of possible complications, including bowel obstruction, bowel injury, seroma, hematoma, recurrence, adhesions, fistula formation, infection, inflammation, chronic pain, and/or allergic reactions to the components of the product.

j.   At the time of his deposition, Dr. Newman had performed approximately 900 hernia repair surgeries with mesh and at least "a hundred or more" with Symbotex.

k.   Dr. Newman has not read an IFU for any hernia mesh product in many years and has no memory of ever reviewing Symbotex's IFU.

l.   At the time of his hernia repair surgery in July 2017, Mr. Patterson was obese (BMI of 31), and had diabetes.

m.   On July 1, 2020, Mr. Patterson sought emergency care for a sharp, burning pain in his abdomen and nausea. He was diagnosed with a small bowel obstruction and incarcerated hernia. Dr. Newman recommended revision surgery to repair the obstruction.

n.   Before the revision surgery, Dr. Newman obtained Mr. Patterson's signed informed consent, and discussed the risks of pain, infection, injury to nearby organs, adhesions, formation of a nonhealing wound, and bowel obstruction.

o.   During the July 2, 2020 revision procedure, Dr. Newman found a "minimal/small hernia with bowel stuck and obstructed at level of old repair." He removed a 3cm segment of bowel at the point of obstruction, which he described in his surgical note as "stuck tightly to the old mesh." He also removed part of the Symbotex mesh.

p.   On July 13, 2020, Mr. Patterson returned to the hospital with a wound infection.

q.   On September 23, 2020, Dr. Charles Newman documented that Mr. Patterson's wound was mostly healed.

**5. Contested issues of fact:**

**<u>Plaintiffs' Position</u>:**

Plaintiffs contend that the contested issues of fact remaining for decision are:

a) <u>Negligence:</u> Whether Covidien failed to use reasonable care in its design and labeling of the Symbotex to prevent harm to Mr. Patterson.

b) <u>AEMLD (Design Defect and Warnings):</u> Whether Covidien defectively designed and did not include proper warning of potential dangers of the Symbotex.

c) <u>Breach of Implied Warranty:</u> Whether Covidien breached its promise or warranty that the Symbotex was fit for the ordinary purposes for which hernia mesh devices are used.

d) <u>Gross Negligence/Wantonness:</u> Whether Covidien consciously acted or failed to act with reckless or conscience disregard of the rights or safety of others.

e) <u>Negligent Misrepresentation, Fraudulent Misrepresentation, and Fraud:</u> Whether Covidien made a false statement (whether it be mistakenly, recklessly, or intentionally) that harmed Mr. Patterson.

f) <u>Fraudulent Concealment:</u> Whether Covidien hid or withheld important facts from Larry Patterson's implanting surgeon, Dr. Newman, III.

g) <u>Loss of Consortium:</u> Whether Tammy Patterson lost her right to the love, company, fellowship, cooperation, assistance, society, affection, services, and comfort of her spouse, and her right to the continuation of the normal marital relationship.

h.) <u>Compensatory Damages:</u> The amount to be awarded to fairly and reasonably compensate Plaintiffs for the harm caused by Covidien's wrongful conduct.

i.) <u>Punitive Damages:</u> Whether Covidien consciously or deliberately acted with wantonness or fraud.

**<u>Defendants' Position</u>:**

a. Whether Symbotex is defective in design due to its polyester material and/or the resorption rate of its porcine collagen film.

b. Whether Defendants failed to adequately warn Dr. Newman regarding risks associated with use of Symbotex.

c. Whether Defendants withheld or otherwise failed to provide information to Dr. Newman about the resorption rate of the collagen film on Symbotex.

 d. Whether Dr. Newman relied on the information provided by Defendants regarding risks associated with use and the resorption rate of the collagen film in deciding to use Symbotex to repair Mr. Patterson's hernia.

 e. Whether Dr. Newman relied on Defendants' skill or judgment to provide a suitable hernia mesh product, and if he relied, whether it resulted in Plaintiffs' injuries.

 f. Whether Defendants breached an implied warranty because Symbotex was defective in design or warning.

 g. The nature and extent of Mr. Patterson's alleged injuries.

 h. Whether Mr. Patterson failed to mitigate his damages.

 i. Whether Symbotex caused Mr. Patterson's alleged injuries.

 j. Whether Defendants' conduct caused Mr. Patterson to suffer emotional distress.

 k. If Mr. Patterson experienced emotional distress, whether that distress was so severe that no reasonable person could be expected to endure it.

**6. Jurisdictional questions:**

None.

**7. Questions raised by pending motions:**

The parties submit that the following questions are pending as of the date of this filing:

 a. Whether the Court will grant the relief sought in Defendants' Emergency Motion to Strike the New Safer Alternative Design Opinions of Dr. Stephen Ferzoco and For Fees and Costs in Bringing Motion (ECF No. 219).

 b. Whether the opinions of Plaintiffs' expert James Mills are admissible under Rule 702 (ECF No. 49).

 c. Whether the opinions of Defendants' expert William Ahrens, M.D., are admissible under Rule 702 (ECF No. 61).

 d. Whether material safety data sheets for polyester chips used in the manufacture of Symbotex are admissible (Defendants' MIL No. 4) (ECF No. 161).

 e. Whether evidence of "medical grade" and "non-medical grade" polyester is admissible (Defendants' MIL No. 4) (ECF No. 161).

 f. Whether evidence about raw polyester procurement and the safety of raw polyester material is admissible (Defendants' MIL No. 4) (ECF No. 161).

11

g.  Whether arguments and questioning using reptile theory are admissible. (Defendants' MIL No. 5) (ECF No. 162).

h.  Whether anchoring, unsubstantiated analogies, and relative wealth comparisons are admissible. (Defendants' MIL No. 5) (ECF No. 162).

i.  Whether improper expert examination regarding Defendants' state of mind and Exponent evidence is admissible. (Defendants' MIL No. 5) (ECF No. 162).

j.  Whether evidence of the presence or absence of company executives is admissible. (Defendants' MIL No. 5) (ECF No. 162).

k.  Whether references to Covidien's corporate inversion or status as an Ireland-domiciled company is admissible. (Defendants' MIL No. 5) (ECF No. 162).

l.  Whether evidence regarding alleged negligence or fault of Dr. Newman III is admissible (Plaintiffs' MIL No. 4) (ECF No. 173).

m.  Whether Plaintiffs' design defect claim under the AEMLD (Count I) and negligent design defect claim (Count IV) fail for lack of a safer alternative design. (ECF Nos. 51, 209, 213).

n.  Limiting Instruction on FDA/510(k): The Court directed the parties to confer and submit a proposed agreed instruction or proposed competing instructions.

- **Plaintiffs' Position:** Plaintiffs' original proposal can be found on the docket at ECF No. 183-2.  However, in light of the Court's guidance at the May 20, 2026 hearing, Plaintiffs agree with the Court, withdraw its initial proposal, and propose the following instruction, which is based on the Court's guidance:

  **Symbotex is still on the market.  The regulatory process does not require the FDA to determine whether the Symbotex is safe or not. Accordingly, the FDA has not determined whether Symbotex is safe or not.  That is up to you, the jury, to decide.**

  **See 5/20/2026 Tr. 36:11–14.**

  If the Court is not inclined to adopt Plaintiffs' proposed instruction above, Plaintiffs have shortened their original proposal as follows:

  The FDA process permitting Symbotex to be on the market is focused on equivalency, not safety.  The FDA does not test medical devices. Being permitted to be marketed is only a determination by the FDA that a medical device is substantially equivalent to another medical device.  Being permitted to be marketed does not reflect an independent evaluation of safety by the FDA and as such is not a safety determination by the FDA.

Being on the market does not in any way denote official approval of the device. Any representation that being on the market is an official approval of a device because of complying with regulations is misleading and constitutes misbranding.

- **Defendants' Position:** In their respective motion in limine briefing, the parties submitted competing limiting instructions regarding 510(k) evidence. See ECF 192 at 2 (Defendants' proposed limiting instruction), ECF 183-2 (Plaintiffs' proposed limiting instruction) as well as cross-cutting briefing on this issue. See ECF 155 and 156 (Defendants' Motion in Limine No. 1) and 183 (Plaintiffs' Opposition to Defendants' Motion in Limine No. 1), 175 and 176 (Plaintiffs' Motion in Limine No. 5) and 192 (Defendants' Opposition to Plaintiffs' Motion in Limine No. 5). At the hearing on May 20, 2026, the Court heard oral argument on the issue. The Court deferred its ruling. The parties have since conferred and represent to the Court that they have been unable to agree on language for the limiting instruction. Defendants continue to propose the following limiting instruction, as stated in their motion in limine briefing: **"FDA cleared Symbotex Mesh for sale in the United States through the 510(k) process in 2013, and Symbotex remains cleared for sale today. 510(k) clearance does not constitute a finding of safety by the FDA and cannot be considered as evidence that the device is safe."**

8. **Issues of law, including evidentiary questions:**

**Plaintiffs submit the following issues of law:** With the exception of objections to deposition designations, exhibits, and jury instructions, Plaintiffs contend there are no special issues of law reserved at this time other than those implicit in the foregoing issues of fact and other than those that have been addressed through motion practice.

**Defendants submit the following issues of law:**

a. Defendants' Entitlement to Post-Verdict *Hammond*/*Green Oil* Hearing

   i. The Court and the parties have discussed the concept of bifurcation as related to Plaintiffs' punitive damages claim. Under Alabama law, evidence of a defendant's financial condition is not admissible at trial. *Ex parte Hsu*, 707 So.2d 223 (Ala. 1997).

   ii. If the jury awards punitive damages, Defendants are entitled to a post-verdict hearing pursuant to the procedures established in *Hammond v. City of Gadsden*, 493 So.2d 1374 (Ala. 1986), and *Green Oil Co. v. Hornsby*, 539 So.2d 218 (Ala. 1989), to review any punitive damages award rendered by the jury. Upon a defendant's request following a verdict for punitive damages, the trial court must conduct an independent reassessment of the award to determine whether it is excessive. Ala. Code § 6-11-23. This post-

13

verdict review is a substantive right under Alabama law that applies in federal diversity actions. *Wilson v. Gillis Advertising Co.*, 145 F.R.D. 578 (N.D. Ala. 1993); *Ruberti v. Ethicon, Inc.*, 2022 WL 17875833 (M.D. Ala. Dec. 22, 2022).

iii.    At this hearing, the trial court must apply the *Green Oil* factors to evaluate the propriety of any punitive damages award, including: (1) the reprehensibility of the defendant's conduct; (2) the relationship between the punitive award and the harm that occurred or was likely to occur; (3) whether the defendant profited from the misconduct; (4) the defendant's financial position; (5) the costs of litigation; (6) whether criminal sanctions have been imposed for similar conduct; and (7) whether other civil actions have been brought for the same conduct. This right to post-verdict judicial review is guaranteed by the Alabama State Constitution and constitutes a constitutionally protected entitlement. *Alfa Financial Corp. v. Key*, 927 F. Supp. 423 (M.D. Ala. 1996).

iv.    Accordingly, Defendants reserve the right to request a *Hammond/Green Oil* hearing in the event of any punitive damages verdict where financial evidence otherwise inadmissible from trial may be presented to the Court as part of its assessment.

b.  Whether Plaintiffs have met their burden of proof as to each element of their claims. Specifically:

i.    Whether Plaintiffs have met their burden to show the availability of a technologically feasible and practical alternative design that would have reduced or prevented Mr. Patterson's alleged injuries.

ii.    Whether Plaintiffs have met their burden to show that Symbotex is defective in design due to its polyester material and porcine collagen coating.

iii.    Whether Plaintiffs have met their burden to show that any design defect in Symbotex caused Mr. Patterson's alleged injuries.

iv.    Whether Plaintiffs have established that Symbotex is not an unavoidably unsafe product pursuant to Comment k of the Restatement of Torts.

v.    Whether Plaintiffs have met their burden to show that Defendants failed to give an adequate warning of the risks associated with Symbotex.

vi.    Whether Plaintiffs have met their burden to show that the adequate warning would have reduced or avoided the foreseeable risks of harm and that the failure to warn rendered the product unsafe.

vii.    Whether Plaintiffs have met their burden to show that the allegedly inadequate warning was the cause of Mr. Patterson's alleged injuries.

14

viii. Whether Plaintiffs have met their burden to show that Dr. Newman relied on the alleged representations or omissions of Defendants and/or Defendants' sales representatives in deciding to use Symbotex to repair Mr. Patterson's hernia.

ix. Whether Mrs. Patterson has established the elements of her loss of consortium claim.

x. Whether Plaintiffs have shown by clear and convincing evidence entitlement to punitive damages under Alabama law.

c. Whether Plaintiffs have met their burden to establish the admissibility of expert opinion testimony offered on their behalf.

d. Resolution of the admissibility of the parties' designated and counter-designated deposition testimony.

**9. Requested amendments to pleadings:**

**Plaintiffs' Position:**

a) Plaintiffs have already withdrawn the following counts:

- Count III-Strict Liability

- Count IX-Breach of Express Warranty

b) Plaintiffs additionally withdraw the following counts:

- Count V-Negligence per se

- Count X- Negligent Infliction of Emotional Distress

- Count XI- Intentional Infliction of Emotional Distress

**Defendants' Position:**

None.

**10. Additional matters to aid in the disposition of the action:**

**Plaintiffs' Position:** Defendants wish to seek confirmation of Judge Kelley's rulings as outlined in (a) below. Given the Court's entry of Judge Kelley's Orders, Plaintiffs do not believe further confirmation is necessary.

a. Confirmation of the Court's adoption of Judge Kelley's rulings on all referred matters, including the June 11, 2026 Order on Defendants' Motion to Exclude the Opinions of Madris Kinard (ECF No. 216) and the June 17, 2026 Order on

15

Plaintiffs' Motion to Exclude the Opinions of Nicholas Benetatos (ECF No. 217).

b. The parties have preliminarily agreed to a number of evidentiary stipulations, which will be memorialized in advance of trial.

c. In anticipation of the Court's jury selection process, Plaintiffs' proposed voir dire questions are attached as Exhibit A and Defendants' proposed voir dire questions are attached as Exhibit B to this Memo.

## 11. Probable length of trial:

**Plaintiffs' Position:** As Plaintiffs have the burden of proof in this MDL's first complex litigation bellwether trial, Plaintiffs will be disproportionately impacted by (and therefore must object to) a trial schedule that gives each side only fifteen or sixteen hours of "chess-clock" hours for their direct and cross-examination time. Plaintiffs respectfully request a minimum of twenty-eight "chess-clock" hours for their direct and cross-examination time in this trial.

**Defendants' Position:**

a. Assuming trial ends at 1:00 p.m. ET each day, Defendants request a three-week trial setting.

b. Each side should have an equal amount of time. The parties should keep track of the time used during each trial day, and at the end of each trial day, meet and confer as to the total time used by each party. If the parties disagree as to the time used, the dispute will be presented to the Court for resolution. Time used during the trial day for sidebar or hearings outside the presence of the jury will be charged against the objecting party, unless the objection is sustained, then the time will be charged against the party opposing the objection.

c. Defendants request one hour per side to present an opening statement and one hour per side to present closing argument.

## 12. Witness list:

Plaintiffs' Witness List is attached as Exhibit C and Defendants' Witness List is attached as Exhibit D to this Memo.

## 13. Exhibit list:

The parties continue to meet and confer to narrow the number of contested exhibits and have jointly moved to submit the exhibit lists in the format requested by the Court by June 29, 2026, which the Court granted on June 18, 2026 (ECF No. 222).

## 14. Positions on remaining objections to the evidence identified in the pretrial disclosure:

**Plaintiffs' Position:** The parties have submitted extensive briefing in this matter to date. Plaintiffs rely upon and maintain the positions set forth in their papers and advanced at oral argument. Except as to the motions that remain outstanding, Plaintiffs do not wish to burden the Court with further argument at this time. Plaintiffs reserve the right to raise any new issues and to respond to any issues raised by Defendants.

**Defendants' Position:** The parties' positions on the evidence are set forth fully in the pending Rule 702 motions, motions *in limine*, Defendants' Emergency Motion to Strike (ECF No. 219), any further briefing Defendants may submit as to summary judgment on Plaintiffs' design defect claim, and objections and counter-designations to designated deposition testimony.

Dated: June 18, 2026

Respectfully submitted,

/s/*Kelsey L. Stokes*

Kelsey L. Stokes
***Plaintiffs' Co-Lead Counsel***
Texas Bar No. 24083912
**STOKES & HOBBS, LP**
5619 Summer Snow Dr.
Houston, TX, 77041
Tel: (832) 260-4447
kstokes@stokeshobbsfirm.com

Timothy M. O'Brien
***Plaintiffs' Co-Lead Counsel***
Florida Bar No. 055565
**LEVIN, PAPANTONIO,
PROCTOR, BUCHANAN, O'BRIEN,
BARR & MOUGEY, P.A.**
316 South Baylen St., Ste. 600
Pensacola, FL 32502
Tel: (850) 435-7084
Fax: (850) 436-6084
tobrien@levinlaw.com

*Attorneys for Plaintiffs*

/s/ *Jessica C. Wilson*

Jessica C. Wilson (BBO No. 692674)
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110-1447
Tel: (617) 406-6000
Fax: (617) 406-6100
jessica.wilson@us.dlapiper.com

Lyn Pruitt*
DLA Piper LLP (US)
10809 Executive Center Drive, Suite 205
Little Rock, AR 72211
Tel.: (501) 944-5510
Fax: (214) 665-5982
lyn.pruitt@us.dlapiper.com

Christopher G. Campbell*
DLA Piper LLP (US)
One Atlantic Center
1201 West Peachtree St, Ste. 2900
Atlanta, GA 30309
Tel: 404-736-7808
Fax: 404-682-7874
christopher.campbell@us.dlapiper.com

*Attorneys for Defendants*

* Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the above document was served via the CM/ECF system upon counsel of record for each party on this 18th day of June, 2026.

/s/ Kelsey L. Stokes
**Plaintiffs' Co-Lead Counsel**

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

<table>
<tr>
<td>

**IN RE: COVIDIEN HERNIA MESH PRODUCTS LIABILITY LITIGATION NO. II,**

**This Document Relates To:**

*Patterson, et al. v. Covidien LP, et al.*
*Case No. 1:22-cv-10153*

</td>
<td>

**MDL No. 1:22-md-03029-PBS**

</td>
</tr>
</table>

## PLAINTIFFS' PROPOSED *VOIR DIRE* QUESTIONS[1]

Plaintiffs Larry and Tammy Patterson, through Co-Lead Counsel for the Plaintiffs' Steering Committee, hereby submit the following *voir dire* questions.

## SUMMARY OF THE CLAIMS

To be agreed to at a later date by the parties and the Court.

A.     **Introduction to the Parties and Counsel**

1)     Based on that short description of the case I just read to you, does anyone have any knowledge about the facts of the case?

2)     Larry Patterson and Tammy Patterson  are the Plaintiffs in this case.  They live in Gadsden, Alabama.  They are represented by Attorneys Tim O'Brien and Kelsey Stokes.  Does anyone know the Pattersons or any of their attorneys?

3)     Covidien is one of the Defendants in this case and it is owned by another party, Medtronic. While Medtronic has offices in the United States, Covidien is located in France and Medtronic is an Irish company.  They are represented by Attorneys

---

[1] In addition to the proposed questions specifically delineated below, Plaintiffs requests leave to ask follow-up questions with respect to each of the questions identified below as well as with respect to the responses provided by each potential juror on both the Court's standard jury questionnaire as well as any case-specific supplemental questionnaire.

1

Jessica Wilson, Lyn Pruett, and David Kohler.   Does anyone know these companies or of any of their attorneys?

B.    **Impartiality:**

1)    As you now know, this case is about a hernia mesh device, do you have any experiences or opinions that you think might cause you to begin jury service in this case favoring either side?

   a)    If yes or maybe, please explain.

2)    Do you believe that you would have difficulty being impartial based on what you have heard about this case thus far?

   a)    If yes, we will speak to you at side bar privately.

3)    You will be the sole judges of the facts.  It's up to you to weigh the evidence and trustworthiness of witnesses and to determine what happened, *i.e.*, the facts.

   a)    Is there anyone who feels they cannot sit in judgment of witnesses?

   b)    Is there anyone who feels that they cannot decide the truth of what happened and/or the evidence that should be believed?

4)    If you have served previously as a juror, do you believe that you will be able to ignore anything you may have learned in the prior case where you served, and follow only the law, including with respect to the burden of proof, that I instruct you to follow in this case?

5)    Do you believe you can set aside any sympathy you may feel for the plaintiff in this case, and decide the case on just the facts and the law?

6)    Do you understand that what the attorneys say in this case is not evidence in this case?

7)    Do you think these cases should be decided by experts with scientific and medical knowledge instead of jurors from all walks of life?

2

**C.**      **Standard of Proof:**

1)      Do you understand that this is not a criminal case but instead a civil case, and thus Mr. Patterson does not need to prove his case according to the criminal standard of beyond a reasonable doubt?

        a)      Prior Civil or Criminal Jury Experience (for those with prior criminal or civil jury experience)

                i)      Explanation of the differences in criminal laws and civil laws and specifically the burden of proof

                ii)      Were you a foreperson during your prior jury service?

**D.**      **Trial Witnesses:**

1)      There will be several witnesses in this case who will testify either live or via deposition testimony in this case.   I asked the attorneys to prepare a list for me which I now will read:

        ** LIST OF WILL CALL/MAY CALL WITNESSES

-      does anyone know any of these witnesses?

**E.**      **Hernias:**

1)      Have you or anyone close to you know well ever suffered from and/or been treated for any type of hernia?

        a)      What type of hernia?

        b)      Did you/he/she undergo surgery for the hernia?

        c)      Did you/he/she get any type of hernia mesh?

        - do you know what type or brand?

**F.**      **Damages:**

1)      Do you believe that even if the Plaintiff proves he is entitled to damages in this case that you would still have some difficulties awarding money as a form of compensation to Plaintiff?

3

2)      The plaintiff is seeking damages for pain and suffering, will you be hesitant to awarding damages to the plaintiff for pain and suffering?

3)      In addition to pain and suffering damages the plaintiff is also seeking punitive damages.  Would you have any problem awarding punitive damages?

**G.**    **Lawsuits Generally:**

1)      Do you have any negative feelings about lawsuits? Do you believe such negative feelings might make it difficult for you to be impartial or unbiased in evaluating the evidence?

        a)      Do you know what tort reform is?

                i)      What feelings, thoughts, opinions and/or attitudes do you have on the subject?

                ii)      Do you feel that there should be a limit on recovery regardless of the injury sustained?

        b)      Does anyone think that we have too many frivolous lawsuits in this country?

2)      Does anyone believe that the mere fact that the Pattersons brought this lawsuit means surely there must be merit to it?

3)      Does anyone believe that the mere fact that the Defendants deny the allegations means surely there must be merit to the defense position?

4)      If you or any member of your family got hurt caused by the fault of another person or company, is there anyone here who would have any problem filing a claim or lawsuit against the other person or company to recover compensation for pain and suffering?

5)      Is there anyone who has any religious beliefs which might interfere with your ability to sit in judgment of the facts in this case?

4

6)    This is a civil case, not a criminal case.  Does everyone understand that no matter what you rule nobody is going to jail?   That this is not a "conviction"?

7)    Is there anyone who believes in general that there are too many personal injury lawsuits that lack merit?

8)    Is there anyone who believes in general juries that, in personal injury lawsuits, juries are awarding unreasonable amounts of money?

9)    Does anyone believe that the laws should impose limits or caps on the amount jurors can award in personal injury cases?

10)   Is there anyone here that believes strongly that people do not take personal responsibility for their actions?

11)   Has anyone or a family member ever made a claim or filed a lawsuit for personal injuries out of any type?

- If so, did it to go to trial?
- Was there anything about that process that would impact your ability to be fair and impartial in this case?

12)   Does anyone have any concerns that any verdict you render in this case, if it is large, might impact the cost of health care, generally, in this country?

## H.    **Personal Experiences**

1)    Do you attend annual physical examinations?
2)    Are you vigilant about following up with all of your doctor appointments?
3)    Do you typically avoid seeing your doctor?

4)    Does anyone have any bumper stickers on their car?

5)    What magazines do you read?

6)    Anyone bring a book here today?  What book?

5

7)    What do you believe is the biggest problem in our society today?

8)    Have you ever belonged to any Civic, or Volunteer Organizations (including charities and non-profits) and, if so, which?

9)    What news sources or outlets do you primarily get your news from?

By show of hands:

a)    CNN or MSNBC (now called MS Now)?

b)    NBC?

c)    CBS?

d)    Fox?

e)    ABC?

f)    Newsmax?

g)    One America Network?

h)    Internet?

10)    Other than a parent for a young child, how many of you are a full or part-time care-giver?

- For a parent? Spouse? Child? Relative? Other?
- How many do you take care of?
- Due to age or injury or some other need?

11)    How many of you have a volunteer job that takes up at least 50% of your time?

12)    How many of you are full-time students?

13)    Has anyone held a position as an Officer (such as President, Director, or Vice President or Treasurer) in any organization, for example:

- PTA
- Homeowners association
- Civic organization
- School
- Club

14)    Does anyone have a master's degree or higher?

15)    Do you, or does anyone in your household, currently work for or have you ever worked for a medical device, pharmaceutical, or medical technology company?

16)    Do you have any family members or close friends who work for a medical device or biotech company here in the Boston area?

17)    Have you or a close family member ever owned stock, mutual funds, or retirement accounts that you know are heavily invested in medical device companies?

18)    Do you belong to any professional associations, civic groups, or social organizations that include employees or executives from local medical technology companies?

19)    Is there anyone who, other than by virtue of being here today, knew or knows someone on this jury panel?

**I.    <u>Work Experience</u>**

1)    Have you ever supervised other employees at work and, if so, what is the greatest number of people you have supervised and what was the title you held?

2)    Have you ever served in the military?

- what branch of service?

- highest rank achieved?

-how long did you serve?

- what was your occupational specialty in the military?

3)    Have you previously ever worked or received training in any of the following areas?
- Legal profession
- Law enforcement
- Medical field
- Insurance companies
- Pharmaceutical or medical devices
- Accounting
- Engineering
- Construction
- Banking or Finance

**J.    <u>Ability to Follow the Law</u>**

1)    During the trial and at the conclusion of the evidence in the case, I will give you all the instructions on the law.  Will all of you be able to follow those instructions of law even if you disagree with the law?

7

-     Anyone have any doubt in their mind about that?

2)     Some witnesses will testify by way of their deposition or prior testimony being read into the record. This is testimony under oath and I will instruct you that you are to regard that testimony the same as if the person had testified here in person. Is there anyone who will not be able to follow that instruction?

3)     I will instruct you at the conclusion of the case that you are to treat a corporation just as you would a person. Does anyone believe that you would have difficulty in treating any of the Defendants as a person, and thus judging and its actions and/or inactions in no better or worse way than the actions of Mr. Patterson?

4)     Does anyone have any physical, moral, or religious reasons that would prevent you from participating as a juror in this case?

5)     Does anyone believe that, for philosophical or religious reasons, that you cannot sit in judgment and make a decision in this case?

6)     Is there anybody here who thinks I should know something about their ability to sit as an impartial juror in this case but I simply didn't ask the right question?

-     and what would that be?

Dated: June 18, 2026

Respectfully submitted,

*/s/ Kelsey L. Stokes*
***Plaintiffs' Co-Lead Counsel***
Texas Bar No. 24083912
**STOKES & HOBBS, LP**
5619 Summer Snow Dr.
Houston, TX  77041
Tel: (832) 260-4447
Email:  kstokes@stokeshobbsfirm.com

Timothy M. O'Brien
***Plaintiffs' Co-Lead Counsel***
Florida Bar No. 055565
**LEVIN, PAPANTONIO, PROCTOR, BUCHANAN, O'BRIEN, BARR & MOUGEY P.A**.
316 South Baylen St., Ste. 600
Pensacola, FL 32502
Tel: (805) 435-7084
Fax: (850) 436-6084
Email: tobrien@levinlaw.com

8

9

**Attorneys for Plaintiffs**

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: COVIDIEN HERNIA MESH
PRODUCTS LIABILITY LITIGATION
NO. II,

This Document Relates To:

*Larry Patterson, et al. v. Covidien LP, et al.*
Case No. 1:22-cv-10153

MDL No. 1:22-md-03029-PBS

**DEFENDANTS COVIDIEN LP AND
SOFRADIM PRODUCTION SAS'S PROPOSED VOIR DIRE**

Defendants Covidien LP ("Covidien") and Sofradim Production SAS ("Sofradim") (collectively, "Defendants"), by and through counsel, hereby request the jury venire be asked the following questions:

1.      Do you, or your immediate family members or close friends, have any special education and/or training in any of the following areas:

        a.      Social Work

        b.      Caregiver

        c.      Psychology/Psychiatry

        d.      Government Regulatory Agencies (like the FDA)

        e.      Marketing/Sales

        f.      Homeopathic/Holistic Medicine

        g.      Pharmaceutical/Medical Device industry

        h.      Truck Driver/trucking industry

        i.      Forklift

2.      How many of you have had education, training, or work experience in healthcare or a related field?

a.    What is your experience in healthcare, and how long ago was it?

3.    What sources or outlets do you primarily get your news from? By show of hands: CNN or MSNBC? NBC? CBS? Fox? ABC? Newsmax? One America Network? Social Media? Podcasts? Documentaries?

4.    Has anyone had, or knows someone close to them who has had, complications as a result of a surgical procedure?

a.    Please explain the type of surgery, and what were the complications?

b.    To the best of your knowledge, what was the cause of the complications?

5.    Has anyone ever decided *not* to proceed with a surgical procedure due to concerns about the associated risks?

6.    With a raise of hand, how many believe that if everything during a surgical procedure is performed perfectly, complications from surgery should never occur?

7.    Have you or someone close to you ever suffered from an unexpected complication from a medical device or prescription medication that you were not warned about?

8.    With a raise of hand, how many of you would *agree* that if a patient experiences a complication with a medical device or product, that means that the device or product is most likely defective in some way?

9.    Please raise your hand if you, or if somebody very close to you (e.g., immediate family member or close friend), has had a hernia.

a.    Who had the hernia?

b.    Do you know where it was located?

c.    Did you, or the other person, have the hernia surgically repaired?

i.    If yes, was it repaired with hernia mesh?

2

      ii.     If yes, do you know the name of the company that manufactured the hernia mesh?

      iii.    Do you know the type of mesh that was used? If yes, please explain.

      iv.    Do you know why the doctor chose that particular mesh to use?

      v.     Did you experience any complications? [*If Yes, request to follow up at bench*].

      vi.    Specifically, please describe what complications you experienced.

      vii.   What caused the complications?

   d.    If not repaired with mesh, please tell us how it was repaired?

      i.     Did you experience any complications?

      ii.    Specifically, please describe what complications you experienced.

      iii.   What caused the complications?

   e.    If you, or the other person, *did not* have the hernia repaired, can you share your reason for not repairing it?

10.    Please raise your hand if you or if someone very close to you has had a medical device or surgical implant placed somewhere in your/their body?

   a.    What was the device/surgical implant?

   b.    Did you experience any complications with the device or implant? [*If Yes, request to follow up at bench*]

      i.     Specifically, please describe what complications you experienced.

      ii.    What caused the complications?

   c.    Are you satisfied or unsatisfied with the device/implant?

3

11.     Has anyone heard, read about, or seen any documentaries, podcasts, or news reports about hernia mesh or lawsuits about hernia mesh?

      a.     Where did you read, hear, or see news about hernia mesh or lawsuits about hernia mesh?

      b.     Do you have an opinion regarding the safety of hernia mesh used to repair a hernia?

         i.     If yes, is your opinion positive or negative? [*If negative, request to follow up at bench*]

12.     Does anyone have an opinion regarding the safety of hernia mesh used to repair a hernia?

      a.     If yes, is your opinion positive or negative? [*If negative, request to follow up at bench*]

13.     With a raise of hand, how many of you believe that the FDA does *not* do an adequate job in preventing dangerous products and devices from making it to market?

14.     With a raise of hand, how many of you believe that surgeons are heavily influenced by pharmaceutical companies and medical device manufacturers when it comes to their decisions about which products and devices to use with their patients?

15.     Please raise your hand if you believe that manufacturers of medical products or devices should have to prove that their products or devices are 100% safe before they are allowed to sell them?

16.     Please raise your hand if you believe that medical device manufacturers do not do enough to test the safety of their products before bringing them to market?

17.    Please raise your hand if you would agree that when someone is injured while using a product, it most likely means that the product is defective?

18.    Please raise your hand if you believe that when it comes to a medical device, the manufacturer of that device should warn of every possible risk associated with it, even if a risk should be known by doctors?

19.    Would you be more likely to award monetary damages against a for-profit corporation because they can afford it?

20.    Please raise your hand if you're familiar with "Material Safety Data Sheets" (MSDS), either through your work or through some other source?

21.    Have you, or has anyone close to you, ever been injured by a product that you or they believe was defective in some way?

    a.    Who was injured?

    b.    Please explain the injury and if you ever returned to work.

22.    Have you, or someone close to you, ever been forced to stop working because of an injury?

    a.    Who was injured and please explain how the injury happened.

23.    With a raise of hand, how many believe that corporations often conceal or fail to disclose important safety information about their products?

24.    Please raise your hand if you or someone very close to you has ever had a negative experience with a large corporation.

    a.    What was the negative experience and how was it resolved?

25.    Have you, or has anyone close to you, been involved in a dispute with a corporation?

5

     a.     What was the dispute about?

     b.     How was the dispute resolved, or is it still ongoing?

26.     Please raise your hand if you believe that corporations have too much power and influence over society today?

27.     Would anyone distrust witnesses for a large for-profit medical device manufacturer?

28.     Please raise your hand if you hold negative *opinions* of, or had a *negative experience* with, medical device companies or pharmaceutical companies?

     a.     How long have you held that opinion?

     b.     ***[Request juror at bench]***: Please tell us what led you to your opinion or what led you to your experience.

29.     Please raise your hand if you or someone close to you has ever had a negative experience with a medical device of any kind (e.g., defibrillator, knee/hip/shoulder implant, etc.).

     a.     How was the dispute resolved?

30.     This case involves an individual, the plaintiff, suing a medical device corporation. Based on this alone, how many feel that they might be starting out leaning even slightly in favor of the individual over the corporation?

31.     The defendant in this case, Covidien, is a corporation. Under the law, corporations are treated the same as individuals – please raise your hand if you have an issue with this, or if you disagree that corporations should be treated in the same way as individuals in the eyes of the justice system.

32.     Please raise your hand if you've heard of Covidien before today.

     a.     How many have a negative opinion of Covidien? ***[Follow up at bench]***

33.     You'll also be hearing about a company called Medtronic, which is the company that acquired Covidien – how many of you were familiar with Medtronic before today?

a.     How many have a negative opinion of Medtronic? *[Follow up at bench]*

34.     How many of you have been a plaintiff in a lawsuit? In other words, have you filed a lawsuit against another party?

a.     Without giving us too many details, what were the major issues involved in the lawsuit? (e.g., insurance coverage dispute, breach of contract, medical malpractice)

b.     What was the outcome?

c.     Were you satisfied with the outcome?

35.     Have you, or anyone close to you, ever been in a situation where you could have filed a lawsuit or made a claim for an injury but decided not to?

a.     Please explain why you didn't file the lawsuit or claim.

36.     In a civil trial, the plaintiff has the burden of proof – in other words, in order for the plaintiff to prevail they must prove that their claims are *more likely true than not*, while the defense does not need to prove that the claims *are not* true. How many believe that it is unfair for the plaintiff to have this burden?

a.     Who has concerns that they might have difficulty setting their sympathy aside and letting this plaintiff walk away with nothing if the plaintiff fails to prove their claims?

37.     With a raise of hand, how many of you are of the opinion that the mere fact that this case made it into this courtroom today means that the plaintiff's claims most likely have at least some merit?

Dated: June 18, 2026

Respectfully submitted,

DEFENDANTS COVIDIEN LP and SOFRADIM
PRODUCTION SAS

*/s/ Jessica C. Wilson*
Jessica C. Wilson (BBO#692674)
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110
Tel: (617) 406-6000
Fax: (617) 406-6100
jessica.wilson@us.dlapiper.com

Lyn Pruitt* (AR Bar No. 84121)
David Koehler* (AR Bar No. 2014238)
DLA PIPER LLP (US)
10809 Executive Center Drive, Suite 205
Little Rock, AR 72211
Tel: (501) 944-5510
Fax: (214) 665-5982
lyn.pruitt@us.dlapiper.com
david.koehler@us.dlapiper.com

Loren H. Brown*
DLA PIPER LLP (US)
1251 Avenue of the Americas, 45th Floor
New York, NY 10020
Tel: (212) 335-4500
Fax: (212) 335-4501
loren.brown@us.dlapiper.com

*Admitted Pro Hac Vice*

8

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

<table>
<tr>
<td>

**IN RE: COVIDIEN HERNIA MESH PRODUCTS LIABILITY LITIGATION NO. II,**

**This Document Relates To:**

***Patterson, et al. v. Covidien LP, et al.***
***Case No. 1:22-cv-10153***

</td>
<td>

**MDL No. 1:22-md-03029-PBS**

</td>
</tr>
</table>

## PLAINTIFFS' WITNESS LIST

Plaintiffs Larry and Tammy Patterson, through Co-Lead Counsel for the Plaintiffs' Steering Committee, hereby submit Plaintiffs' Witness List in the above-captioned matter, identifying those persons that they expect to call at trial or may call at trial, either live or by deposition, if the need arises:

| List of Witnesses Plaintiffs <u>Will</u> Call | |
|---|---|
| ***Witness*** | ***Appearance (Live/By Deposition)*** |
| Larry Patterson<br>714 1st St NE,<br>Attalla, Alabama 35954 | Live |
| Lucian Newman, III<br>419 South 5th St.<br>Gadsden, AL 35901 | Live |
| Laura M. Plunkett, Ph.D., D.A.B.T<br>1127 Eldridge Pkwy, Suite 300335<br>Houston, TX 77077 | Live |
| Stephen John Ferzoco, M.D.<br>1 Lyons Street<br>Dedham, MA 02026 | Live |
| Yves Bayon<br>France | By Deposition |
| Tarek Downs<br>Address Unknown | By Deposition |
| Phillipe Gravagna<br>France | By Deposition |

1

| List of Witnesses Plaintiffs __Will__ Call | |
|---|---|
| *Witness* | *Appearance (Live/By Deposition)* |
| Jeffrey Lane<br>Address Unknown | By Deposition |

| List of Witnesses Plaintiff __May__ Call | |
|---|---|
| *Witness* | *Appearance (Live/By Deposition)* |
| Tammy Patterson<br>714 1st St NE<br>Attalla, Alabama 35954 | Live |
| Madris Kinard, MBA<br>1539 Heritage Lane<br>York, PA 17403 | Live |
| Ahmed El-Ghannam, Ph.D.<br>University of North Carolina at Charlotte<br>9201 University City Blvd.<br>Duke Centennial Hall, Room 177<br>Charlotte, North Carolina 28223 | Live |
| Paul J. Michaels, M.D.<br>4000 Beach Loop Road<br>Bandon, Oregon 97411 | Live |
| James A. Mills<br>4984 El Camino Real, Suite 210<br>Los Altos, CA 94022 | Live |
| Jeffrey Zaruby<br>Address Unknown | By Deposition |
| Scott Chouinard<br>Address Unknown | By Deposition |
| Julie Lecuivre<br>France | By Deposition |
| Defendants' Corporate Representative at Trial | By Deposition |

Additionally, Plaintiffs reserve the right to supplement or amend this list, including any new witness identified by any on-going or additional discovery. In addition, Plaintiffs reserve the right to call any and all witnesses who Defendants identify on their witness list, and to amend and/or to supplement this disclosure as necessary in light of the Court's rulings or otherwise. Plaintiffs reserve the right to call any witness necessary to authenticate, lay foundation, and/or establish the admissibility of any exhibits. Plaintiffs further reserve the right to object to the designation of witnesses made by Defendants.

2

Dated: June 18, 2026

Respectfully submitted,

*/s/ Kelsey L. Stokes*
**Plaintiffs' Co-Lead Counsel**
Texas Bar No. 24083912
**STOKES & HOBBS, LP**
5619 Summer Snow Dr.
Houston, TX  77041
Tel: (832) 260-4447
Email:  kstokes@stokeshobbsfirm.com

Timothy M. O'Brien
**Plaintiffs' Co-Lead Counsel**
Florida Bar No. 055565
**LEVIN, PAPANTONIO,
PROCTOR, BUCHANAN, O'BRIEN,
BARR & MOUGEY P.A**.
316 South Baylen St., Ste. 600
Pensacola, FL 32502
Tel: (805) 435-7084
Fax: (850) 436-6084
Email: tobrien@levinlaw.com

**Attorneys for Plaintiffs**

3

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: COVIDIEN HERNIA MESH
PRODUCTS LIABILITY LITIGATION NO.
II,

This Document Relates To:                    MDL No. 1:22-md-03029-PBS

*Larry Patterson, et al. v. Covidien LP, et al.*
Case No. 1:22-cv-10153

**DEFENDANTS COVIDIEN LP AND
SOFRADIM PRODUCTION SAS'S WITNESS LIST**

Defendants Covidien LP ("Covidien") and Sofradim Production SAS ("Sofradim") (collectively, "Defendants"), by and through counsel, hereby serve this list of witnesses that Defendants expect to or may call during Defendants' case in chief.

Defendants reserve the right to supplement or amend this list as appropriate before or during trial, including in consideration of Plaintiffs' witness list, deposition designations, or exhibit list. Defendants expressly reserve the right to call live or by deposition any witness identified by Plaintiffs, any witness for whom Plaintiffs designate deposition testimony, any witness identified hereinafter through discovery, any witness deemed necessary for purposes of impeachment or rebuttal, and any healthcare provider of Plaintiffs identified in Plaintiffs' medical records. Defendants reserve the right to call any custodian of records or other witness necessary to authenticate, lay foundation, and/or establish the admissibility of exhibits. In identifying the persons listed below, Defendants do not waive any objection to deposition testimony, exhibits, evidence, or argument. Defendants' experts and employees should be contacted only through Defendants' counsel. Defendants' identification of "will call" or "may call" is based on Defendants' reasonable expectation, but Defendants' assessment is ongoing, and Defendants anticipate that these designations may change as pretrial proceedings and trial progress.

## I.    CASE-SPECIFIC FACT WITNESSES

1. **Jonathan Fuller, M.D.**
   *(May call) (By deposition)*

2. **Charles Newman, M.D.**
   *(May call) (By deposition)*

3. **Lucian Newman, M.D.**
   *(May call) (By deposition)*

4. **Larry Patterson**
   c/o Kelsey L. Stokes, Esq.
   Stokes & Hobbs, LP
   5619 Summer Snow Drive
   Houston, TX 77041
   *(May call) (Live or by deposition)*

5. **Tammy Patterson**
   c/o Kelsey L. Stokes, Esq.
   Stokes & Hobbs, LP
   5619 Summer Snow Drive
   Houston, TX 77041
   *(May call) (Live or by deposition)*

## II.    EXPERT WITNESSES[1]

6. **William Ahrens, M.D.**
   Atrium Health Carolinas Medical Center
   1000 Blythe Boulevard
   Charlotte, NC 20203
   *(Will call) (Live)*

7. **Nicholas Benetatos, Ph.D.**
   3440 Market Street, Suite 600
   Philadelphia, PA 19104
   *(Will call) (Live)*

8. **Corey Deeken, Ph.D.**
   69 High Trails Drive
   Eureka, MO 63025
   *(Will call) (Live)*

---

[1] Defendants incorporate by reference Defendants' Expert Witness Disclosure dated April 25, 2025.

9. **Mohammad Issa, M.D.**
   Brigham and Women's Faulkner Hospital, Pain Management Center
   1153 Centre Street, 7th Floor
   Jamaica Plain, MA 02103
   *(Will call) (Live)*

10. **Keith Morris-Schaffer, Ph.D., DABT, ERT**
    485 Lexington Avenue, Suite 2200
    New York, NY 10017
    *(May call) (Live)*

11. **Ryan Wade, Ph.D.**
    One UCity Square
    25 N. 28th Street, Suite 700
    Philadelphia, PA 19104
    *(May call) (Live)*

12. **Andrew Wright, M.D.**
    University of Washington Medicine Hernia Center
    1211 NE 70th Street
    Seattle, WA 98115
    *(Will call) (Live)*

III.    **<u>GENERAL FACT WITNESSES</u>**

13. **Yves Bayon**
    France
    c/o Counsel for Covidien
    DLA PIPER LLP (US)
    33 Arch Street, 26th Floor
    Boston, MA  02110
    (617) 406-6000
    *(May call) (By deposition)*

14. **Philippe Gravagna**
    France
    c/o Counsel for Covidien
    DLA PIPER LLP (US)
    33 Arch Street, 26th Floor
    Boston, MA  02110
    (617) 406-6000
    *(May call) (By deposition)*

15. **Julie Lecuivre**
    France

c/o Counsel for Covidien
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110
(617) 406-6000
*(May call) (By deposition)*

16. **Linda Spinnler**
France
c/o Counsel for Covidien
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110
(617) 406-6000
*(May call) (Live or by deposition)*

17. **Michel Therin**
France
*(May call) (Live)*

18. **Paul Worthen**
Middletown, CT
c/o Counsel for Covidien
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110
(617) 406-6000
*(May call) (Live)*

Dated: June 17, 2026

Respectfully submitted,

DEFENDANTS COVIDIEN LP and SOFRADIM
PRODUCTION SAS

*/s/ Jessica C. Wilson*
Jessica C. Wilson (BBO#692674)
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110
Tel: (617) 406-6000
Fax: (617) 406-6100
jessica.wilson@us.dlapiper.com

Lyn Pruitt* (AR Bar No. 84121)
David Koehler* (AR Bar No. 2014238)
DLA PIPER LLP (US)
10809 Executive Center Drive, Suite 205
Little Rock, AR 72211
Tel: (501) 944-5510
Fax: (214) 665-5982
lyn.pruitt@us.dlapiper.com
david.koehler@us.dlapiper.com

Loren H. Brown*
DLA PIPER LLP (US)
1251 Avenue of the Americas, 45th Floor
New York, NY 10020
Tel: (212) 335-4500
Fax: (212) 335-4501
loren.brown@us.dlapiper.com
*Admitted Pro Hac Vice*