**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE: COVIDIEN HERNIA MESH PRODUCTS LIABILITY LITIGATION NO. II,**<br><br>**This Document Relates To:**<br><br>***Patterson, et al. v. Covidien LP, et al.***<br>**Case No. 1:22-cv-10153** | **MDL No. 1:22-md-03029-PBS** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR REMITTITUR**

TABLE OF CONTENTS

INTRODUCTION .......... 1

LEGAL STANDARD .......... 1

ARGUMENT .......... 1

I. Larry Patterson Suffered Catastrophic Damages and Faces Very Significant Damages in the Future as a Result of Defendants' Conduct. .......... 1

A. Since 2020, Mr. Patterson Had Two Major Abdominal Surgeries and Has Endured a Chronic Infection and Open Wound. .......... 2

B. Mr. Patterson Faces Multiple Complex Abdominal Wall Reconstruction Surgeries in the Future and Will Suffer Additional Damage to His Abdomen as a Result. .......... 7

C. Tammy Patterson Has Sustained Very Significant Consortium Damages as a Result of the Life-Altering Injuries Her Husband Has Suffered. .......... 10

II. The Jury's Verdict Was Neither Excessive Nor Infected by Passion and Prejudice. .......... 13

CONCLUSION .......... 20

## INTRODUCTION

Defendants have filed their motion for remittitur arguing to this Court that it should disregard the jury's verdict and remit the verdict to $3 million for Plaintiff Larry Patterson and $100,000.00 for his wife, Tammy Patterson. Because Alabama law presumes the correctness of the jury's verdict as to pain and suffering damages such as the Pattersons endured, and because Alabama substantive law does not permit remittitur unless there is record evidence that the verdict is based upon bias, passion, corruption, or other improper motive of the jury, and because this jury appropriately awarded damages for the catastrophic injuries sustained by Plaintiff, this Court should deny Defendants' motion.

## LEGAL STANDARD

Federal courts sitting in diversity jurisdiction must apply state substantive law to determine whether a jury award is excessive and remittitur is appropriate. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 429-31 (1996). In *Campbell v. Kennedy*, 275 So.3d 507, 518-19 (Ala. 2018), the Alabama Supreme Court stated "[i]n the absence of a flawed verdict, a comparison of jury verdicts in similar cases is not the standard for determining whether a jury verdict should be reduced." A court cannot find a verdict is flawed (such that consideration of remittitur is warranted), unless there is record evidence that the verdict was based upon bias, passion, corruption, or other improper motive of the jury. *Hammond v. City of Gadsden,* 493 So.2d 1374, 1379 (Ala. 1986). These mandatory factors cannot be inferred from verdict size. *Id.*

## ARGUMENT

### I. Larry Patterson Suffered Catastrophic Damages and Faces Very Significant Damages in the Future as a Result of Defendants' Conduct.

The evidence introduced at trial was uncontradicted and unrebutted that Larry Patterson suffered catastrophic injuries over the last six years and will endure very significant damages in

the future. The evidence shows that Mr. Patterson has endured brutal pain and suffering from the two 2020 surgeries, the persistent open infected wound, and is facing an incredibly difficult road ahead with at least two major complex abdominal wall reconstructions awaiting him.[1]

### A. Since 2020, Mr. Patterson Had Two Major Abdominal Surgeries and Has Endured a Chronic Infection and Open Wound.

Dr. Newman implanted the Symbotex hernia mesh into Mr. Patterson in July 2017.[2] This implant triggered a series of horrific events and surgeries and will result in very complex surgeries that Mr. Patterson will face in the future. As the jury learned from Dr. Stephen Ferzoco: "the coating on the Symbotex mesh failed, allowing the small bowel to become densely adherent to the mesh, causing the development of a small bowel obstruction leading to the necessity for an en bloc resection of the bowel with the mesh, and the subsequent problems with wound infections, recurrent hernia, and retained infected mesh."[3] Because of the early resorption of the Symbotex barrier and the resulting injuries which it caused, Mr. Patterson sustained "catastrophic injuries" and will need at least two complex abdominal wall reconstruction surgeries to address the ongoing problems.[4]

Three weeks after the 2017 hernia repair surgery, Mr. Patterson was able to return to work without restrictions.[5] In July 2020, things went wrong. As Mrs. Patterson described: "He was in pain and was not being able to eat a lot or eat, didn't feel like eating. He was having issues, not being able to use the bathroom."[6] The mesh had to be removed because it had adhered to his small

---

[1] The "as-played" runs of the various witnesses who testified by video deposition are filed on the docket at Doc. 270 and any reference herein to any deposition is used only if it is found in the "as-played" run for the video deposition testimony heard by the jury. References to the official trial transcript pages are marked as "TR" followed by the pages and lines cited. Admitted trial exhibits are referenced by their "Trial Exhibit" number.

[2] TR 3-43:25-48:7; Trial Exh. 5009.0013.

[3] TR 6-101:20-25.

[4] TR at 6-28:18-29:7, 6-40:15-42:13, 6-65:9-77:25, 6-85:16-86:14, 6-93:21-94:11, 7-31:1-18, 7:42:10-21, 7-50:11-51:10.

[5] TR 5-42:17-43:19.

[6] TR 9-68:21-69:1.

intestine which caused a serious bowel obstruction.[7] When he was readmitted to the hospital, he had to be intubated:

> The nurses came in the night before the surgery, and they was trying to place a tube down my throat. And they wouldn't let me use the bathroom like in two days, couple of days and I hadn't ate because I was in so much pain and they wouldn't let me have any water or anything to drink. Upon trying to place the tube through my nose and throat, I couldn't control my gag reflex so I just started throwing up and they just like - - like a hot soda coming up out of my throat, burning, coming out of my nose. And just like a coffee ground, liquid-looking stuff, brown. And eventually they had to pull the tube back from my nose. They couldn't - - they couldn't get the tube inserted because I couldn't control my gag reflex. I was throwing up. There was just stuff coming up out of my stomach.[8]

After Dr. Newman told Mr. Patterson that the mesh had gotten wrapped around his intestines, Mr. Patterson was scared and alone, because Mrs. Patterson could not be with him (due to COVID protocols): "I was beside myself when he told me that."[9] Mr. Patterson described the difference between the 2017 hernia repair surgery and his 2020 surgery to repair the bowel obstruction as different as "daylight and dark".[10] Plaintiffs' surgeon expert, Dr. Ferzoco, testified that, while the 2017 hernia repair was "straightforward and simple", the 2020 surgery for the bowel obstruction and resection was far more complex because the Symbotex mesh was densely adherent to the bowel which involved not only a resection of the bowel but the reconstruction of the abdominal wall; this involved "an advanced hernia repair technique" called a "component separation".[11] The treating surgeon, Dr. Lucian Newman III, testified that, because the mesh was densely adherent to the bowel wall and could not be removed from the bowel wall, he had to perform an enterectomy which is a "big step" and "radical deviation" which he normally would

---

[7] TR 5-45:2-45:18; TR 6-101:20-25.
[8] TR 5-45:19-46:15.
[9] TR 5-46:20-47:13.
[10] TR 5-49:3-22.
[11] TR at 5:132:9-21, 6-68:5-69:25.

only have to perform in rare cases involving cancer patients.[12] As Mr. Patterson described for the jury, the 2020 injury and surgery involved "terrible, devastating pain."[13] The 2017 surgery involved 2 to 3 small holes but the "hernia mesh removal surgery was more like a five- or six-inch hole just opened up, you can put your hand in."[14]

It was Mrs. Patterson who initially informed Mr. Patterson what Dr. Newman had to do with taking out some of the mesh together a portion of his small intestine:

> He was upset, to say the least. He was anxious. I could tell in his voice, the way he talked, he was scared. He was kind of shocked his self about what they had to do to cut out and piece his intestines together and not knowing how that was going to affect him.[15]

After the surgery, Dr. Newman eventually told Mr. Patterson that "he got out what mesh he could get out that was tied around the intestine, and he said we had to take out part of the intestine, and he said it was still mesh in there that was just too hard and too dangerous to go after."[16] Polyester is a "very highly inflammatory material that can be very difficult to remove" and Dr. Newman was unable to remove all the mesh material from Mr. Patterson's abdominal wall.[17] Because not all the mesh could be removed, Mr. Patterson has had constant worry that he would have more complications due to the mesh that remained behind: "Not getting it all out, I was concerned later on down the road there was going to be another problem, that it was going to get tied up in my intestines again, and I'd have to go through it again. It was dramatic the first time. You know, the second time is on your mind all the time."[18]

It did not take long before the problems from the remaining mesh manifested. While

[12] TR at 3-72:13-73:21.
[13] TR at 5-49:18.
[14] TR at 5:5-17.
[15] TR at 9-72:16-20.
[16] TR 5-47:20-48:5.
[17] TR at 6-72:8-75:12.
[18] TR 5-48:6-16.

recuperating at home from the bowel obstruction surgery, the surgical wound had gotten infected and began leaking from Mr. Patterson's abdomen to the floor: "I looked down and thought there was coffee on the floor I spilled. I told my wife I spilled coffee, and she walked over to where I was at, and she said, 'It's not coffee.'"[19] Mr. Patterson then noticed the room had a "horrendous odor in it, and I was just nauseous."[20] The odor was so bad that it caused his daughter to vomit.[21] As Mr. Patterson told the jury: "Eventually I just had to send him out onto our deck outside because the smell that started to come out was unbelievable. I have never smelled anything like that before in my life. It was toxic, I mean, toxic."[22]

There was "dingy, dark red, green-looking stuff" coming out of his wound site; Mrs. Patterson wrapped a large towel around him while she went to get the keys to take him to the hospital but by the time she got back with the keys, the fluid "started soaking through that towel."[23]

After he got to the emergency room, Mr. Patterson was seen by Dr. Newman: "He said it appears infected. He said, 'I got to open it back up.'"[24] The fluid leaking from his wound was draining down his pants leg and got to the point where it started dripping off the bed and the nurses had to place a bucket to catch the fluid.[25] Mr. Patterson watched while Dr. Newman opened him back up:

> Suture removal started right away. He just started taking the staples out, going down in front of my stomach, it started opening back up. And I'm just sitting there looking at the inside of my own self. And eventually when he got on down above the - - just started opening up, I could see inside myself, I had to turn my head. But there was no anesthesia. There wasn't nothing. It was just taking out, it was hurting, just watching your inside opened back up.[26]

---

[19] TR 5-52:10-13.
[20] TR 5-52:14-15.
[21] TR 5-52:21-22.
[22] TR 9-76:3-6.
[23] TR 5-52:22-53:2.
[24] TR 5-54:14-18.
[25] TR 5-54:19-55:1.
[26] TR 5-55:2-12.

As Mrs. Patterson told the jury: "Emotionally, I could tell he was scared. He didn't really know if he was going to be able to pull through what was going on at the time."[27] Mr. Patterson continues to have thoughts about that: "It's traumatizing. It just still brings back thoughts about that."[28]

The polyester Dr. Newman had to leave behind is what led to the infection and this additional surgery and prevents the wound from fully healing and closing.[29] While in the hospital, Mr. Patterson was treated with intravenous antibiotics.[30] After a several-day hospital stay, Mr. Patterson discharged him with antibiotic pills as well as a wound vacuum.[31] The wound vacuum involved placing a four-inch piece of foam down into the wound opening, placing a barrier over it, and then running the vacuum: "The machine will start pulling like on your insides and on the incision to start trying to get it to go together and close up."[32] The recovery period itself was very stressful for Mr. Patterson: "Well, there was times I felt bad because I had all this going on physically, and it was just - - it was just as terrible and worse mentally with all this going on. Financially it was a ruin."[33]

The wound has never completely healed or closed since 2020. [34] As Mr. Patterson testified, "It still drains and bleed, and I have to keep it bandaged each day."[35] Mr. Patterson changes his bandages two to three times per day and the leaking fluid typically will "be like bright red tinge, dark red tinge, brown, dingy, green, yellow, different mixtures of colors just all into one."[36] Remnants of the hernia mesh protrude into the open wound and he has been informed by his current

---

[27] TR 9-79:19-21.
[28] TR 5-56:12-13.
[29] TR at 6-76:15-77:4.
[30] TR 5-59:11-18.
[31] TR 5-59:11-61:12.
[32] TR 5-61:2-12.
[33] TR 5-64:21-24.
[34] TR 5-66:22-67:16.
[35] TR 5-66:22-67:16.
[36] TR at 5-67:25-68:4, 70:25-71:6.

surgeon that the open wound cannot be closed because of the remaining mesh.[37] Mr. Patterson has a persistent "infection and inflammatory reaction" due to this remaining mesh.[38] The jury learned from Dr. Ferzoco that because the polyester remains in the body, he will "be left with ongoing infection and an inability to clear that infection until the decision is made to go back in and remove whatever was left behind."[39]

Additionally, there is a large knot around the wound site "like a tennis ball" that makes a "gurgling sound when you push on it."[40] In August 2025, it appeared that Mr. Patterson was getting "another blockage" because, as he described: "I was hurting from the front straight through the back of my back, intense sharp pains. And it was similar to the hernia mesh removal, the day before that happened."[41] This reflects that Mr. Patterson now has small bowel protruding through a recurrent hernia defect as a result of the defective Symbotex mesh.[42] Mr. Patterson is still seeing a surgeon for his injuries and the surgeon has advised him he will need more surgeries in the future.[43]

**B. Mr. Patterson Faces Multiple Complex Abdominal Wall Reconstruction Surgeries in the Future and Will Suffer Additional Damage to His Abdomen as a Result.**

Because of the early resorption of the Symbotex barrier and the resulting injuries which it caused, Mr. Patterson sustained "catastrophic injuries" including a non-healing open wound as well as a giant, recurrent hernia that will require at least two more "staged, complex" surgeries to address because of the necessary abdominal wall reconstruction.[44] As Dr. Ferzoco informed the surgery:

Well, again, you're going to be dealing with resection or debridement of a wider

[37] TR at 5-72:3-22, 5-73:6-23, 74:12-75:2, 126:19-127:19; TR 6-79:15-24.
[38] TR at 6-82:5-11; Trial Exh. 5014.0021.
[39] TR at 5-146:6-16.
[40] TR at 5-75:3-14.
[41] TR at 5-75:15-23.
[42] TR at 6-80:19-81:12; 93:19-94:11.
[43] TR at 5-76:21-77:6.
[44] TR at 6-28:18-29:7, 6-40:15-42:13, 6-65:9-77:25, 6-85:16-86:14, 6-93:21-94:11, 7-31:1-18, 7:42:10-21, 7-50:11-51:10.

area of tissue to get back to healthy tissue. You can't leave any residual mesh in. We know the mesh is highly inflammatory, is densely adhered to that tissue. That all needs to be cut away.

Anything that contains synthetic mesh needs to be removed. Anything that has polyester has to go away. That's going to take a small-ish defect and make it a larger defect. That larger defect then needs to be closed. So, again, it's a very staged, complex operation.[45]

His current surgeon told him: "He said on surgery, he said definitely you're look at surgeries down the road."[46] Dr. Ferzoco testified that Mr. Patterson "needs surgery sooner rather than later."[47] While the initial hernia was a small 3cm sized hernia, because of the 2020 surgeries removing the mesh and surrounding tissue, Mr. Patterson currently has an 8.5cm recurrent hernia which is, medically speaking, a "giant hernia".[48] He now is a "complex abdominal patient" as a result of the giant recurrent hernia and the persistent infection with non-healing wound that has been there for six years.[49] Mr. Patterson's future surgeries necessarily involve very significant risks including having to re-operate on the bowel, enterocutaneous fistula, and stool leaking through the abdominal wall.[50] Dr. Ferzoco explained to the jury: "He is going to, unfortunately, face a similar reconstruction like I've discussed in my chapter and have shown examples of prior patients that I've cared for."[51] During this testimony, Dr. Ferzoco shared the following images from his SAGES textbook chapter, demonstrating the complexity of Mr. Patterson's medical condition and future surgeries[52]:

[45] TR at 85:25-86:14.
[46] TR 76:24-77:2.
[47] TR at 96:2-5.
[48] TR at 7-31:1-18, 7-50:11-51:10, 7-42:10-21.
[49] TR 6-77:11-17, 6:82:5-11, 6-83:10-84:13
[50] TR 6-84:14-85:15; Trial Exh. 6049.
[51] TR 7-50:6-51:10.
[52] Decl. of Kelsey Stokes, attached hereto as Attachment "A".



Adapted from Choi et al, 2012

## BIOLOGIC MATERIALS

For nearly a decade, surgeons have been utilizing biologic materials for hernia repair and AWR. One could argue that these materials have revolutionized the way surgeons treat complex AWR. Biologics have allowed surgeons to tackle cases that they would otherwise be unable to handle and provide hope to a significant group of patients.

However, enthusiasm of utilizing these materials is tempered with their high cost and lack of significant long-term data. In addition, as mentioned previously, these materials should be avoided in a bridged situation. Results have demonstrated a significantly higher recurrence rate when compared to those cases in which primary fascial closure can be achieved. (Figure 1A – 1C)

If the decision is made to bridge the defect, a surgeon must decide which technique to utilize to suture in the mesh.



**Figure 1A–1C. Failed bridging of a large abdominal defect using biologic mesh.**
**(A) The biologic was sutured as an inlay due to a frozen abdomen; (B) Despite what appears to be a reasonable outcome in the short-term; (C) the long-term result revealed significant laxity of the abdominal wall that required reoperation.**

*Abdominal Wall Reconstruction* 107

DX-001.00005

Mr. Patterson has never been without a job since high school as it is very important to him to know that he's taking care of his family.[53] As Mrs. Patterson told the jury, Mr. Patterson as "the sole breadwinner of the house" loved work and "always been a hard worker at a job or even at home."[54] Mr. Patterson is very worried about the future surgeries and also about not being able to take care of his family:

> Biggest concern I've had since all this been going on compared to before it went on, I really had no problem providing for my family. It wasn't a luxury life, but they got what they needed and sometimes what they wanted. And when you get to that point, you just sort of feel useless. I sitting home three months, I couldn't do anything. My wife, she's not physically able to work, and that compounded more

[53] TR 5-30:13-18.
[54] TR 9-64:14-23.

> worries and worries, you know, sort of putting more and more on the pressure, on the stress.[55]

As he told the jury, "So either way it goes, you're going to be walking across a bed of burning charcoals any way it goes. Just future surgery like that, it's just another worry you keep on your mind all the time."[56]

Mrs. Patterson agrees that this has been stressful for him: "it's been a strain on us because he feels like he's not providing for me like he needs to or wants to."[57] Mr. Patterson's wife described the changes she has seen in her husband since the catastrophic injuries began:

> Pretty much everything about him has changed. He referred to his self many times as being Superman before the 2020 surgery. There was nothing he couldn't do or thought he couldn't do.
>
> It's like he's broken now. His whole personality has changed. Everything about him has changed. He said, "I had to retire my Superman cape." He said, "I can't do it anymore."[58]

**C. Tammy Patterson Has Sustained Very Significant Consortium Damages as a Result of the Life-Altering Injuries Her Husband Has Suffered.**

Mr. Patterson and his wife Tammy have been married for 32 years.[59] The only time they have ever been separated was during the two July 2020 hospital admissions when Mrs. Patterson could not be with Mr. Patterson (because of the hospital COVID protocols).[60] As Mr. Patterson described the marriage: "She's basically my lifeline every day."[61] It upset Mrs. Patterson that she was unable to be with Mr. Patterson during his time of need: "I was hurt. I was kind of - - I felt bad because I couldn't be there because we're kind of each other's rocks. One supports the other.

---

[55] TR at 5:78:2-10.
[56] TR at 5:77:19-22.
[57] TR at 9-86:25-87:4.
[58] TR at 9-85:9-15.
[59] TR 5-23:6-9; TR 9-59:4-9.
[60] TR 9-60:24-61:2, 9-69:25-70:6, 9-77:21-24, 9-79:23-80:1.
[61] TR 5-24:12-13.

Without the other support, you're just kind of weak and lost yourself."[62]

Mr. Patterson's July 2020 hospitalization and the bowel obstruction surgery impacted Mrs. Patterson as well: "I was upset, highly upset. I was kind of shocked. I mean, I knew the situation was probably bad, but I didn't know to what extent of how bad it was until I was told what they had to do."[63] She testified that she has great difficulty even looking at his surgical site because: "It hurts to look at."[64]

Mr. Patterson described what his wife was doing for him after the bowel obstruction surgery in 2020: "I guess basically to put it in simple layman terms, anatomy of the body, the right leg loves the left, and the left loves the right because they have to have both each other to survive, to get around. That's the way she was. She went above and beyond what she should have been doing."[65] The same was true while Mr. Patterson was recovering from the second July 2020 surgery.[66] She described taking care of him as "like an invalid or an elderly person I was basically trying to take care of."[67] As Mrs. Patterson testified:

> Q: But did you have in-home nurse care? In other words, was there someone there to actually take care of him during that time after Dr. Newman had to take that mesh and intestine out of him?
>
> A: No.
>
> Q: So who was taking care of him?
>
> A: Me.
>
> Q: And tell our jury how you were taking care of him. And specifically what I'm asking is what kind of things were you doing, particularly in those first two months, after he got home from the hospital?

---

[62] TR at 9-73:12-17.
[63] TR at 9-71:14-21.
[64] TR at 9-73:2-9:74:8.
[65] TR 5-51:9-20.
[66] TR 5-64:18-65:7.
[67] TR 9-80:25-81:1.

A: Well, what was I not doing. I mean, I did everything from bathing, dressing. It was, like I said, it was like taking care of an infant of an elderly person that couldn't take care of theirself. I did everything.

Q: All right.

A: He's going to be upset with me, but I even had to clean him when he went to the bathroom. And to him, he never was the type of person that had wanted any help with bathing or having to clean him from the bathroom.

Q: All right.

A: It was embarrassing to him.

Q: And tell our jury how you were feeling during these two months while you were doing all this stuff for your husband that you had been with for all that time since the early 1990s. How did that make you feel?

A: I felt bad for him because I know how it made me feel.[68]

At one point during his recovery, Mr. Patterson had fallen down while Mrs. Patterson was asleep from exhaustion.[69] She tried but was unable to help him up and so he had maneuver himself up off the floor, with the wound vac, because Mrs. Patterson "had nobody to call at the time that could help."[70] This made Mrs. Patterson feel "helpless": "Like I was failing because I couldn't do what needed to be done."[71] Even to the present time, Mrs. Patterson has to do simple things for Mr. Patterson such as put his socks on, that he cannot do because of his residual problems.[72]

What the Pattersons are facing in the future with the need for additional surgeries has caused significant distress to Mrs. Patterson. As she told the jury:

Q: . . . Tell our jury about how you feel and whether you have any worries about the future and specifically with regard to Larry?

A: I'm terrified. Dr. Echeverri has said that he will have to have more surgeries on account of this. We was told that there's still mesh in there that needs to

[68] TR 9-81:24-82:18.
[69] TR 9-83:4-84:10.
[70] TR 9-83:4-84:10.
[71] TR 9-83:4-84:10.
[72] TR 5-119:17-23.

> come out. Problem is it's where it can't be taken out. There's possibly more mesh that's around his intestines. He doesn't want to have to cut into the intestines any more on account of what happened the last time, on account it could be more severe.
>
> Q: So how does that impact you?
>
> A: I'm in fear of losing my rock.[73]

Mrs. Patterson's testimony and affect from the stand were nothing short of compelling. As the Court observed to counsel at sidebar: "She was one of the most empathic people I've seen on the stand in a while. Heartfelt, it's been devastating for her."[74]

## II. The Jury's Verdict Was Neither Excessive Nor Infected by Passion and Prejudice.

Put simply, this Court should deny Defendants' motion for because there is no comparison of the cases cited in Defendants' cite in their motion to what Mr. Patterson and his wife have been through and there is no record evidence of any improper jury conduct, passion or bias.

Federal courts sitting in diversity jurisdiction must apply state substantive law to determine whether a jury award is excessive and remittitur is appropriate. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 429-31 (1996). The substantive law of Alabama on remittitur is different than the federal case law on when remittitur should be granted as Alabama requires a showing of record evidence of improper conduct or consideration by the jury, and it cannot be implied by the size of the verdict:

> We make no attempt to enumerate all the factors which may be considered by the trial court. We instead leave that to its sound discretion. We do emphasize, however, that only where the record establishes that the award is excessive as a matter of law, or where it is established and reflected in the record that the verdict is based upon bias, passion, corruption, or other improper motive may a trial court order a new trial or remittitur.
>
> . . . A trial court may not conditionally reduce a jury verdict merely because it believes the verdict overcompensates the plaintiff; nor may the trial court substitute

[73] TR 9-88:6-17.
[74] TR 11-5:12-13.

its judgment for that of the jury.

*Hammond v. City of Gadsden,* 493 So.2d 1374, 1379 (Ala. 1986) (same); *see also Hornady Trucklines v. Meadows*, 847 So.2d 908, 922 (Ala. 2002); *Pitt v. Century II, Inc.*, 631 So.2d 235, 240 (Ala. 1993) (same); *Ledbetter v. United Ins. Co. of America*, 845 F. Supp. 844, 846 (M.D. Ala. 1994) (applying Alabama law to analysis of motion for remittitur).

On this *Erie* analysis, the two cases cited by Defendants do not support their argument that this Court should use federal common law rather than the common law of the state of Alabama in deciding this state law damages question. In *Pepsi Cola Bottling Co. of Luverne, Inc. v. Allen*, 572 So.2d 434, 436 (Ala. 1990), the Alabama Supreme Court expressly reasoned that the trial court, in rejecting a motion for remittitur, acted appropriately in light of *Hammond* considerations. *Id.* It does not vacate or otherwise void the holding in *Hammond* that the record must show that the verdict is based upon bias, passion, corruption, or other improper motive. In so ruling, the court also stated that, under Alabama law: "Jury verdicts are presumed to be correct." *Id.*

A closer reading of *Daniels v. East Ala. Paving, Inc.*, 740 So.2d 1033 (Ala. 1999), than that provided in Defendants' illuminates what the actual holding was in that case. There, the Alabama Supreme Court expressed concerns about what it saw as very high verdicts and understood why the trial court would want to remit the verdicts, but it actually concluded: "Given the fact that the trial court found no improper motive on the part of the jury, and the fact that there is no fixed standard for determining an award for physical pain and suffering, we conclude that the trial court erred in ordering the remittiturs" *Id.* at 1050 (citing *Hammond*, 493 So.2d 1374).

The *Daniels* court further explained the necessity showing from the record the bias, passion, corruption, or improper motive of the jury and that could not be found where the jury "'passed all voir dire, was attentive, exhibited an unbiased view, and apparently decided what

juries are chosen to decide.'" *Id.*; *see also National Ins. Ass'n v. Sockwell*, 829 So.2d 111, 133-34 (Ala. 2002) (citing *Hammond* and finding that, because there no record of any improper jury action and there was "nothing in the record to indicate that the jury's award was the result of passion, bias, corruption or other improper motive", the trial judge properly refused to remit the compensatory damages award). Further, the *Daniels* court observed that, in Alabama: "Jury verdicts are presumed correct 'especially where damages are awarded for pain and suffering.'" *Daniels,* 740 So.2d at 1045 (quoting *Coca-Cola Bottling Co. v. Parker*, 451 So.2d 786, 788 (Ala. 1984)). Accordingly, *Daniels* does not support Defendants' argument and, in fact, serves to prove the point that Alabama law is different than the federal law; this Court must apply Alabama law and the holding in *Hammond*. *Gasperini*, 518 U.S. at 429-31; *see also Steinke v Beach Bungee, Inc.*, 105 F.3d 192, 197 (4th Cir. 1997) (holding that state law governs the issue of the excessiveness of a jury award in a federal diversity case); *Consorti v. Armstrong World Indus., Inc.*, 103 F.3d 2, 4 (2nd Cir. 1995) (same).

Here, Defendants have cited neither record evidence nor any "as a matter of law" limitation (such as a statutory cap on compensatory damages awardable) that would warrant this Court remitting the verdict awarded by the jury in *Patterson*. The likely reason why is because the *Patterson* record reflects that the jury was diligent, attentive, on-time, and asked intelligent questions and, because there is no such record evidence, there is no record evidence cited in Defendants' motion of any "corruption" or "improper motive" on the part of the jury:

- THE COURT: Good morning. You know, I should comment that you're the most on-time jury I think I've ever had, so thank you very much for appearing on time. You're diligently paying attention as we near the end of testimony this week.[75]

- MS. PRUITT: . . . Thank you for being here this long, extended period of time. You have been so conscientious and taken so many notes, and I want to thank you.[76]

[75] TR 11-9:20:23.
[76] TR 13-62:7-9.

- THE COURT: Thank you. And on behalf of everyone in this room, I want to thank you for your service. I think you won an award. I don't remember any of my jury deliberations going into the fourth day, so thank you very much for your time and attention. You were always on time and you were always taking notes, and I very much respect the difficulty of this case in terms of the scientific evidence as well as the people involved. It was an extremely well tried case.[77]

Furthermore, the jury asked numerous intelligent and directed questions pertaining to the science and damages throughout the trial of the case.[78]

Defendants have cited no case in Alabama which indicates that remittitur is required or allowed under the record evidence before this Court. In fact, nearly every case cited by Defendants stands for the proposition that remittitur was not warranted due to the lack of record evidence showing the jury acted inappropriately. This is a unique case and there is no equivalent hernia mesh case that has been tried to date with the level of damages sustained by Mr. and Mrs. Patterson. Alabama departs from federal law on remittitur because the Alabama record evidence requirement does not permit trial court's to imply bias, passion, or prejudice implicit from the size of the verdict. "We do emphasize, however, that only where the record establishes that the award is excessive as a matter of law, or where it is established and reflected in the record that the verdict is based upon bias, passion, corruption, or other improper motive may a trial court order a new trial or remittitur." *Hammond*, 493 So.2d at 1379.

As discussed, *supra*, this case concerns very profound, life-altering injuries which the uncontradicted evidence showed were "catastrophic". Alabama law does not warrant a remittitur based upon the size of the verdict awarded by the *Patterson* jury. The hernia mesh cases cited by Defendants establish neither a floor nor a ceiling for what a reasonable jury may find in another

---

[77] TR 16-12:21-13:3.
[78] TR 7-31:1-3, 11-53:11-17, 11-55:16-22, 11-79:5-81:15, 11-87:15-20, 12-24:16-25:15, 12-100:3-14.

plaintiff's case.

It cannot be overlooked that the verdict reflects not only what Mr. Patterson has endured over the past 6 years but is facing for decades in the future. The same is true of Mrs. Patterson who lives in fear of losing her husband to medical complications and is dealing with a shell of the man she had as a husband before the bowel obstruction occurred in 2020. The record evidence shows that Mr. Patterson has a statistical life expectancy of 21.9 years[79] and, using simple math, awarding approximately $2.75 million per year for what he has gone through and the frightful surgeries and resulting damage he will face in the future does not constitute a "clear abuse" by the jury as to require a new trial. *See, e.g., In re: 3M Combat Arms Earplug Prods. Liab. Litig.*, Case No. 7:20-cv-00113-MCR-GRJ Doc. 160 (10/25/22) (applying Washington law)[80] (denying Defendants' motion for new trial and/or remittitur in product liability case involving tinnitus and some hearing loss where jury awarded $50 million in non-economic compensatory damages); *A.Y. v. Janssen Pharmaceuticals, Inc.*, 224 A.3d 1, 29-30 (Pa. Super. 2019) (applying Tennessee law) (affirming trial court's denial of motion for new trial and/or remittitur in product liability case involving prescription drug Risperdal which caused gynecomastia, i.e., development of breast tissue in a male, and jury awarded $70 million in non-economic compensatory damages because, under Tennessee law, "jury has wide latitude in assessing non-economic damages"); *Bayes v. Biomet, Inc.*, 55 F.4th 643, 650-51 (8th Cir. 2022) (applying Missouri law) (affirming trial court's denial of motion for new remittitur in artificial hip implant product liability case where jury awarded $20 million in non-economic compensatory damages for patient who had multiple hip dislocations and revision surgeries); *Hyrmoc v. Ethicon, Inc.*, 2021 WL 836854 (N.J. App. Div. 2021) (applying North Carolina law) (in *McGinnis* case, denying new trial on the basis of excess verdict where jury

[79] TR 9-91:21-92:4; Trial Exh. 6048.
[80] Attached hereto as Attachment "B".

awarded $23 million to transvaginal mesh plaintiff, and $10 million to her husband, as a result of mesh infiltrating vaginal wall necessitating explant of the mesh as well as causing vulvar and lower body pain and incontinence issues); *In re E.I. DuPont de Nemours & Co C-8 Personal Injury Litig.*, 529 F. Supp.3d 720, 731-42 (S.D. Ohio 2021), *aff'd* 54 F.4th 912 (6th Cir. 2022) (applying Ohio law) (denying motion for new trial or remittitur where jury awarded $40 million in non-economic damages to man who sustained testicular cancer as a result of exposure to contaminated drinking water).

Furthermore, under the substantive law of Alabama, a "side-by-side" comparison requires a calculation of what an older verdict's dollar value means in present dollar value: "The present value of a dollar as compared with its value in former years must be considered in determining whether the amount awarded is excessive." *Langdon v. Miller*, 160 So.2d 479 480 (Ala. 1964). Plaintiffs' expert economist has prepared such an analysis, using three different indices to calculate a range of present dollar values for the five cases cited in the immediately preceding paragraph.[81] As discussed in his Declaration, the three different indices are: the Consumer Price Index (i.e., inflation); the Dow Jones Industrial Average Index; and the S&P 500 Index.[82]

The verdict dates for each of the five verdicts are derived from the following citations:

- *In re: 3M Combat Arms Earplug Prods. Liab. Litig. (Vilsmeyer* case*)*, Case No. 7:20-cv-00113-MCR-GRJ (Doc. 139[83]);
- *A.Y. v. Janssen Pharmaceuticals, Inc.*, 224 A.3d at 8;
- *Bayes v. Biomet, Inc.*, 55 F.4th at 646;
- *Hyrmoc v. Ethicon, Inc.*, (*McGinnis* case), 2021 WL 12152581, *2 (N.J. Sup.Ct.)
- *In re E.I. DuPont de Nemours & Co C-8 Personal Injury Litig. (Abbott* case), 2020 WL 7863331, **2-7 (S.D. Ohio 2020).

[81] 09/28/26 Decl. of James Mills, attached hereto as Attachment "C".
[82] *Id.* at paras. 5-6.
[83] Attached hereto as Attachment "D".

The present dollar value ranges using the three different indices for each of the 5 cases cited, *supra*, are as follows[84]:

| VERDICT YEAR | VERDICT MONTH | CASE NAME | Value @ Verdict | CPI INDEX | Current Value | DJIA | Current Value | S&P 500 | Current Value |
|---|---|---|---|---|---|---|---|---|---|
| 2016 | July | A.Y. (Janssen Risdperdal) | $70,000,000 | 240.01 | **$93,895,254** | 19,762.60 | **$170,242,291** | 2,238.83 | **$214,033,669** |
| 2018 | May | McGinnis (Bard TVM) | $33,000,000 | 251.11 | $42,308,231 | 23,327.46 | $67,992,339 | 2,506.85 | **$90,113,688** |
| 2020 | October | Bayes (Biomet Hip) | $20,000,000 | 258.81 | $24,878,482 | 30,606.48 | $31,407,264 | 3,756.07 | $36,450,332 |
| 2020 | March | Abbott (DuPont C8) | $40,000,000 | 258.81 | $49,756,965 | 30,606.48 | $62,814,528 | 3,756.07 | $72,900,665 |
| 2022 | March | Vilsmeyer (3M Ear Plugs) | $50,000,000 | 292.66 | $55,002,392 | 33,147.25 | $72,499,664 | 3,839.50 | **$89,145,722** |

As discussed in the case reports cited above, each of these verdicts involved injuries resulting from product liability (or, in the case of *Abbott*, contaminated water liability). Each of the cases was a bellwether case in an MDL or a state court coordinated proceeding. Each of the cases involved injuries less than or in the same order of magnitude as the injuries suffered by Mr. Patterson and his wife. The range of those verdicts which survived remittitur challenges is broader context for the jury's determination in this case.

Defendants made a choice not to contest damages and, instead, put most of their focus on specific causation. Defendants gambled and this jury then heard, without any contradiction from Defendants' experts or counsel, that Plaintiff suffered "catastrophic damages", that he underwent two very traumatic surgeries, now is a "complex abdominal" patient with a giant hernia, that will require at least two major complex abdominal wall reconstruction surgeries - - both of which carry with them very significant risks and will cause further damage to his abdominal wall as a result of the need to remove the residual polyester mesh left inside him. Defendants did not speak to damages at all in their closing argument and certainly presented no evidence from their own

[84] Attachment "D" at Exh. "B".

surgeon expert, Dr. Andrew Wright, to defend against a potential jury award for the catastrophic damages he has sustained and will sustain over the rest of his life. This issue is to be decided under Alabama law and Alabama law does not countenance the relief requested by Defendants because Defendants have utterly failed to point to any record evidence that the verdict is based upon bias, passion, corruption, or other improper motive. The law of Alabama does not permit trial courts to imply any such bias, passion, corruption, or other improper motive as a result of the size of the verdict. Accordingly, this Court should deny Defendants' motion.

**CONCLUSION**

For the foregoing and previously stated reasons, Plaintiffs request the Court to deny Defendants' motion for remittitur.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Kelsey L. Stokes*
***Plaintiffs' Co-Lead Counsel***
Texas Bar No. 24083912
**STOKES & HOBBS, LP**
5619 Summer Snow Dr.
Houston, TX 77041
Tel: (832) 260-4447
Email: kstokes@stokeshobbsfirm.com

Timothy M. O'Brien
***Plaintiffs' Co-Lead Counsel***
Florida Bar No. 055565
**LEVIN, PAPANTONIO,**
**PROCTOR, BUCHANAN, O'BRIEN,**
**BARR & MOUGEY P.A.**
316 South Baylen St., Ste. 600
Pensacola, FL 32502
Tel: (805) 435-7084
Fax: (850) 436-6084
Email: tobrien@levinlaw.com

**Attorneys for Plaintiffs**

**CERTIFICATE OF SERVICE**

I, Kelsey L. Stokes, certify that on October 5, 2026 I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of this electronic filing to all counsel of record.

*/s/ Kelsey L. Stokes*
***Plaintiffs' Co-Lead Counsel***